**Derek J. HOGGETT and Investa, Inc, Appellants,**

v.

**David L. BROWN, individually; David L. Brown, Trustee; Richard K. Carlin; Roger C. Wadsworth; W.K. Group Holdings; D.B. Technology, Inc., f/k/a, Max Ret, Inc., successor in interest to, D.B. Technology, Inc.; Scott Brown; AND Jeff Brown, Appellees.**

No. 14–95–01016–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 4, 1997.

**474**

Rayburn Putney & Sidney N. Floyd, William Hagans & Andrea Lore, Charles Scott Schwager, Houston, for appellants.

Jennifer House, David Gunn, Kevin J. McEvity, Mark Allen Mathews, Houston, for appellees.

Before LEE, AMIDEI and FOWLER, JJ.

## OPINION

LEE, Justice.

This appeal involves a dispute between the shareholders of Telescan, Inc., a company

that provided computer access to stock market information. Derek Hoggett, appellant, sued his fellow shareholders and various other individuals and entities associated with them, appellees, claiming Telescan's merger with another company was fraudulent and violated their shareholders agreement. The jury found in favor of Hoggett and awarded him $2.6 million in actual and exemplary damages. Following the verdict, the trial court disregarded the jury findings and entered judgment for appellees. The judgment, however, awarded Hoggett's company, Investa, Inc., repayment on certain loans made by Investa and Hoggett. It also awarded appellees $13,600 in attorney's fees for defense of Hoggett's prior declaratory judgment claim. Appealing from the trial court's judgment, Hoggett raises twenty points of error that complain of the trial court's refusal to enter judgment on the verdict and various other rulings. Appellees raise five conditional cross-points attacking the jury's findings. We affirm the judgment as modified herein.

## I. BACKGROUND

### A. The Idea

In 1978, Richard Carlin, a biochemist, met Derek Hoggett, a stockbroker. Carlin and Hoggett became friends, exchanging ideas on stock market trends and trading stocks together. In 1982, Carlin told Hoggett that he had developed software that could retrieve and analyze stock market information. Carlin told Hoggett this software could be marketed but that he had no time or money to invest in the product. Hoggett agreed to put up an initial investment with money from Investa, Inc. ("Investa"), a company wholly-owned by Hoggett that raised money for limited partnerships.[1] He also filed the necessary documents to form Telescan, Inc. ("Telescan"), a company devoted to developing and marketing the "Telescan Analyzer," a computer database providing access to stock market information. The articles of incorporation designated Hoggett and Carlin as the initial directors. The initial shares were issued equally to Hoggett and Carlin.

By August 1983, funds contributed by both Hoggett and Carlin had been exhausted.

### B. The First Contribution

From August 1983, to March 1984, Hoggett kept Telescan in business with funds from the sale of his condominium and earnings from Investa. Because its product could not analyze all of the stocks listed on the New York Stock Exchange, the company still had no customers by March 1984. In need of capital to upgrade and market the product, Hoggett went to Roger Wadsworth, who owned an investment partnership, WK Group Holdings ("WK"). Wadsworth introduced Hogget and Carlin to David Brown, an experienced businessman with a technology background. Hoggett and Carlin initially proposed giving Brown 20% of the company for a $100,000 contribution. Eventually, they agreed to give Brown one-third of the company in return for a $500,000 investment. For setting up the deal, Brown paid Wadsworth's partnership, WK, a commission out of his Telescan stock. At this point, the ownership of Telescan was as follows: 33 1/3% owned by Hoggett, 33 1/3% owned by Carlin, 31 2/3% owned by Brown, as trustee for his children, and 1 2/3% owned by WK.

Brown opened a line of credit at Western Bank for $500,000 to be paid in $250,000 increments based on budgets approved by him. Hoggett and Carlin wanted to use Brown's contribution not only for start-up costs, but also to recover the funds they had already invested, leaving Brown with the sole risk of loss. Therefore, on the advice of counsel, Brown suggested operating the business through a limited partnership so he could take full advantage of the tax benefits. On April 12, 1984, the parties formed Telescan Ltd., a limited partnership, to conduct Telescan's business. Under the limited partnership agreement, Brown, as limited partner, contributed $500,000 and Telescan, as general partner, contributed its assets and liabilities. Both Hoggett and Carlin were salaried employees of the partnership. Hoggett worked part-time as the chief operating

---

**1.** Although Investa was a party below and is a party on appeal, most of the issues deal solely with Hoggett. Therefore, we will refer only to Hoggett unless otherwise necessary.

officer while Carlin worked full-time to develop the product. At the time the parties formed the limited partnership, they also executed a shareholders agreement that, among other things, set rules for the sale or transfer of stock by the Telescan shareholders.

## C. The Second Contribution

By the end of 1984, Telescan had exhausted Brown's $500,000 contribution. Some of this money went to repay Hoggett and Carlin their initial investment, but most of the money went to development and marketing. By early 1985, Carlin had yet to work out "bugs" in the product and Telescan had only a few hundred customers. Because costs were exceeding revenues, Telescan needed another infusion of capital. Although Brown had earlier indicated that $500,000 was his limit, Hoggett and Carlin approached Brown for additional funds. Brown's first response was to request a majority stake in Telescan, but Hoggett and Carlin refused

As a result, Brown helped Hoggett and Carlin obtain a loan from Western Bank. The loan was originally for $750,000, but with two years of interest to be paid by Brown and an additional $50,000 requested by Hoggett, the debt ultimately totalled $925,000. Brown pledged stock from one of his companies, Time Energy, as collateral for the loan. Because the value of that stock was significantly less than the loan amount, Brown also personally guaranteed the note. Brown further executed a repurchase agreement giving him the right to repurchase the note from Western Bank upon default. While Hoggett objected to incurring this debt, he did not want to relinquish his ownership interest in Telescan and eventually signed the note on behalf of the limited partnership.

For Brown's assistance in obtaining financing, Telescan agreed to amend the limited partnership agreement to, among other things, give Brown, or a company in which he owned more than 5%, the two-year right to use its computer technology for non-competing purposes. The amended limited partnership agreement was executed prior to the Western Bank loan and imposed several duties on Telescan as the general partner

First, it required Telescan to deliver a completed product by a date certain. Second, it required Carlin to provide documentation of the computer software according to a set schedule. Third, it required Telescan to give a warranty that Brown's contribution, in the form of the Western Bank loan, would be sufficient to meet all needs of the general partner, Telescan, and that no additional capital contributions would be requested of the limited partner, Brown. If Carlin defaulted by failing to properly provide documentation, Brown had the right to immediately cease further funding. Similarly, if Telescan defaulted by failing to deliver a completed product or requesting additional capital that would exceed a $1 million cap, Brown was entitled to 51% ownership of the company upon a payment of $5,000.

## D. The Third Contribution

By late 1985, Telescan had exhausted the entire Western Bank loan. Almost $600,000 of that loan was used to pay back Brown's initial $500,000 contribution, plus overdrafts on the initial line of credit and interest. The remaining funds went to product development and marketing. Although the "bugs" in the product had been removed and sales had increased, Telescan still faced a "cash flow" crisis, owing payroll and $30,000 in back taxes. Between late October and early December 1985, Investa and Hoggett loaned the limited partnership and Telescan $40,000. These loans were used to satisfy Telescan's payroll and pay company expenses. During this time, Brown agreed, at the request of Hoggett and Carlin, to loan Telescan $50,000 to keep the company afloat until it could finalize third-party financing.

By mid-December 1985, Brown felt Hoggett had misrepresented the financial health of the company and voted with Carlin to remove Hoggett as Telescan's president. Hoggett told prospective lenders at the time about the potential for litigation between the company principals, thereby hampering any future financing. At the same time, the long distance carrier that connected Telescan's service to its customers threatened to disconnect Telescan's customers. Concerned about his investment, Brown consulted with his at-

torney, Lance Farrell, about his options. Farrell suggested that Brown could simply "write off" the loss, place the company in bankruptcy, or implement a merger to attract more capital. Brown testified that while a merger was suggested, there were no discussions or plans for a merger at this time.

By early 1986, the relationship between Hoggett, Carlin and Brown had deteriorated irreparably. Carlin thought Hoggett was not doing his job. In fact, prior to Hoggett's removal in December 1985, Carlin tried twice to remove Hoggett as president of Telescan. Both times Carlin was voted down at board meetings by Brown and Hoggett. Carlin also thought Hoggett was trying to hire away Telescan employees to start a competing business after Hoggett employed a contractor to analyze the software documentation provided by Carlin under the amended limited partnership agreement. Hoggett, on the other hand, accused Carlin of falsifying data during product development. He also accused Carlin of lying that a $1,000 per month raise provided under the amended limited partnership agreement was needed for his wife's medical expenses when instead it was for personal use. Complaining that the software documentation was inadequate, Hoggett further claimed Carlin was in default under the amended limited partnership agreement and demanded additional documentation.

Lastly, Hoggett thought Carlin was becoming too independent and was suspicious of Carlin's relationship with Brown. Hoggett resented Brown for putting Telescan in debt and repeatedly complained that Brown had no equity in the company. In fact, during the cash flow crisis in late 1985 and early 1986, Hoggett refused Brown's offer to contribute an additional $250,000 to Telescan, even though the company desperately needed capital. Hoggett's refusal was due in part to Brown's contention, which Hogget disputed, that the contribution would have put Telescan over the $1 million cap and in default under the amended limited partnership agreement.

Hoggett resisted Brown's attempts to mediate disputes between he and Carlin. Indeed, throughout late 1985 and early 1986, Hoggett engaged in negotiations to buy out Brown's interest. That offer called for some unnamed investors to contribute $250,000 to Telescan and assume payments on the Western Bank loan. Brown would be required to leave his Time Energy stock as collateral, but would tender his Telescan shares and relinquish any participation in management. The other shareholders were to pledge their shares as collateral for repayment of the Western Bank loan by the new investors and put their shares in a voting trust with Hoggett and the new investors as trustees. Brown refused this offer, stating that he would have had to give up his equity in the company while remaining personally liable on the Western Bank note.

There were also discussions about placing the company in bankruptcy. According to both Brown and Carlin, Hoggett repeatedly threatened to place the company in bankruptcy or foreclose on the Investa loans. Brown testified that placing the company into bankruptcy would have forced him, as guarantor, to repurchase the Western Bank note and probably foreclose on all of the company's assets, thereby making him the sole owner of the company. Hoggett not only denied making these threats, but also testified that neither of these options would have destroyed the company.

### E. The Merger

According to Brown, it was not until he received Hoggett's February 3, 1986, letter proposing bankruptcy, that he decided to move ahead with the merger. After contacting Carlin and Wadsworth days earlier, Brown formed DB Technology, Inc. ("DB") on February 6, 1986. Brown and his family were the sole owners of DB. Brown, Carlin, and Wadsworth were directors of DB and Brown's son, Jeff, was president. Although Hoggett was excluded from participation in the new company, he and the other Telescan shareholders were to receive, in return for cancellation of their shares, an earnout certificate that entitled them to a maximum, *pro rata* earnout of $300,000 from any net profits of DB during its first three years of operation. Four days later, at the Telescan board of directors meeting, Brown and Carlin voted

in favor of the merger and directed a vote by the shareholders. Complaining that he did not receive proper advance notice of the merger plan, Hoggett cast the lone dissenting vote.

On February 26, 1986, Hoggett wrote all the shareholders, asserting the merger plan could not be "consummated" without his vote under the provision of the shareholders agreement requiring approval of corporate actions by 80% of the shareholders. Hoggett also objected to the board of directors resolution recommending the merger plan to the shareholders on the ground that Brown was never a director of Telescan. The shareholders meeting took place as planned on March 4, 1986, and all of the shareholders, except Hoggett, voted for the merger. The following day, Hoggett filed this lawsuit. After the merger, DB continued to market the Telescan Analyzer under the assumed name of "Telescan." However, because DB lost money, no earnouts were ever paid. Eventually, Max Ret, a publicly traded corporation, bought substantially all the assets of DB and changed its name to Telescan.

## II. THE LAWSUIT

In his lawsuit, Hoggett sought damages for breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing, fraud and failure to pay contractual loans. Appellees counterclaimed, asserting breach of contract, breach of fiduciary duty, malicious prosecution, and interference with contractual relations and business opportunities. At the first trial in late 1989, the court directed a verdict against Hoggett, but submitted the appellees' counterclaims, which the jury answered negatively. The court, however, awarded appellees attorney's fees incurred in defense of Hoggett's declaratory judgment claim. On appeal, this court, in an unpublished opinion, reversed the judgment based on the exclusion of expert testimony and remanded the case, including the attorney's fees claim, to the trial court. *Hoggett v. Brown*, No. A14–90–00211–CV, 1991 WL 137412 (Tex.App.—Houston [14th Dist.] 1991, writ denied) (not designated for publication).

At the second trial, the court submitted issues on Brown's authority as director,

fraud, and waiver of the "80% voting provision" in the shareholders agreement. The jury found in Hoggett's favor on all issues except waiver and awarded damages. Hoggett moved for entry of judgment, requesting a constructive trust or buy out of his shares based on the favorable jury findings and for the court to disregard the waiver finding. Appellees filed a response to Hoggett's motion and filed their own Motion For Judgment, To Disregard Jury Findings, and for "Rule 279 . . . Findings." The trial court granted appellees' motion and denied Hoggett's motion, but ordered appellees to repay the loans to Investa. The court also awarded appellees attorney's fees for defense of Hoggett's prior declaratory judgment action and applied these fees as an offset to appellees' repayment of the loans. After his motion for new trial was overruled by operation of law, Hoggett perfected this appeal.

## III. THE JURY'S FINDINGS

In points of error one and two, and four through eight, Hoggett contends the trial court erred in disregarding the jury findings that: (1) Brown was not a director at the time of the merger, (2) Brown waived the 80% voting provision in the shareholders agreement, (3) Brown committed fraud, and (4) Hoggett was entitled to actual and punitive damages for fraud, the reasonable value of his stock at the time of the merger, and attorney's fees.

A trial court may disregard a jury's finding on a question when there is no evidence to support the finding or when the question is immaterial. *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex.1994); *C & R Transport Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex.1966). In determining whether there is no evidence to support the jury's finding, we must consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Alm v. Aluminum Co.*, 717 S.W.2d 588, 593 (Tex.1986), *cert denied*, 498 U.S. 847, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990); *Navarette v. Temple Indep. School Dist.*, 706 S.W.2d 308, 309 (Tex.1986). A question is immaterial when it should not have been submitted or when it

was properly submitted, but has been rendered immaterial by other findings. *Spencer*, 876 S.W.2d at 157.

## A. Dissenting Shareholders' Rights Under Article 5.12

■ At the outset, we address appellees' contention that all of the jury findings favorable to Hoggett are immaterial because his exclusive remedy was under article 5.12 of the Texas Business Corporation Act ("the Act").[2] Article 5.12 sets forth the procedure by which a shareholder, who dissents to a merger or sale of assets, may exercise his or her rights. TEX. BUS. & COM.CODE ANN. art. 5.12 (Vernon 1980), *amended by* Act of September 1, 1983, 68th Leg., R.S., ch. 442 § 9 1983 Tex. Gen. Laws 2511, 2570–73. Article 5.12G, in particular, states:

In the absence of fraud in the transaction, the remedy provided by this Article to a shareholder objecting to any corporate action referred to in Article 5.11 of this Act is the exclusive remedy for recovery of the value of his shares or money damages to such shareholder with respect to such corporate action; and if the existing, surviving, or new corporation, as the case may be, complies with the requirements of this Article, any such shareholder who fails to comply with the requirements of this Article shall not be entitled to bring suit for the recovery of the value of his shares or money damages to such shareholders with respect to such corporate action.

*Id.*

The First Court of Appeals, in *Gannon v. Baker*, 807 S.W.2d 793 (Tex.App.—Houston [1st Dist.]), *rev'd on other grounds*, 818 S.W.2d 754 (Tex.1991), addressed the nature of the remedy under article 5.12G. There, Gannon was a 50% partner in an outdoor sign business. 807 S.W.2d at 795. To obtain needed capital, Gannon and his partner, Nail, brought in Baker. *Id.* The parties agreed to incorporate and give Baker 60% of the stock, with 20% each going to Gannon and Nail. *Id.*

The parties also entered into a trust agreement that allowed Baker in good faith to vote the other two owners' shares for so long as the corporation needed Baker's personal guaranty on obligations. *Id.*

Gannon and Nail filed suit, asserting causes of action against Baker for conversion, breach of fiduciary duty, usurption of corporate opportunity, breach of contract and fraud. *Id.* at 795–96. They alleged their agreement to an unequal stock distribution was only in exchange for Baker's oral promise to "level" stock ownership when the trust agreement terminated. *Id.* at 795. They also alleged Baker breached the trust agreement by influencing creditors to continue requiring his personal guarantee on corporate debts when it was no longer necessary and by refusing to put the oral leveling agreement in writing as he had promised. *Id.* After Nail sold his interest to Baker and while suit was pending, the corporation sold substantially all of its assets to another corporation for $8 million. Gannon exercised his dissenting shareholder's rights of appraisal, arguing the fair value of the corporation was $11 million and that he was entitled to 50% of the stock under the oral leveling agreement. *Id.* at 795–96.

Baker and the corporation moved for appointment of an appraiser and for summary judgment. *Id.* at 796. The trial court granted partial summary judgment in favor of Baker for breach of the trust agreement and related claims. *Id.* It also ordered the appointment of appraisers to determine the value of the corporation and Gannon's ownership interest as of the day before the sale. *Id.* The court entered judgment for Gannon based on the appraisers' determination and denied Gannon any further relief. *Id.* On appeal, Gannon argued the court erred in dismissing the claim for breach of the trust agreement and related claims of self-dealing and fraud. *Id.* In holding Gannon was enti-

---

**2.** This suit was filed on March 5, 1986, and governed by the Act in effect prior to the amendments in 1987, 1989, 1991, and 1993. *See* Act of August 31, 1987, 70th Leg,. R.S., ch. 93, §§ 1–35, 1987 Tex. Gen. Laws 203, 203–25; Act of June 15, 1989, 71st Leg., R.S., ch 801, §§ 1–44, 1989 Tex. Gen. Laws 3610, 3610–3644 (effective August 28, 1989); Act of June 1991, 72nd Leg., R.S, ch. 901, §§ 1–43, 1991 Tex. Gen. Laws 3161, 3161–92 (effective August 28, 1991); Act of September 1, 1993, 73rd Leg., R.S., ch. 215, §§ 2.01–2.21, 1993 Tex. Gen. Laws 418, 441–59.

tled to litigate claims connected to the sale of corporate assets, the court explained:

> *While appraisal is generally the exclusive remedy to a dissenting shareholder, it is not the exclusive remedy available when there is fraud in the transaction.* See TEX. BUS. CORP. ACT ANN. art. 5.12 Comment of Bar Committee—1967 (Vernon 1980). The allegation that Baker failed to disclose material information and engaged in self-dealing in distributing corporate assets are allegations of fraud in the transaction. The Texas Bar Committee stated its intention that a dissenting shareholder invoking the "exclusive" remedy of appraisal should not be precluded from challenging the regularity of the corporate reorganization. *Id.* Therefore, Gannon is entitled to receive payment from the corporation in the amount of the fair value of his stock. In addition, *if Gannon proves there was fraud or irregularity in the sale of assets that affected the fair value of his stock, he may recover special damages from the corporation for the losses occasioned by the fraud or irregularity.*

*Id.* at 796–97.

The court also concluded Gannon could not recover for acts not connected with the sale of corporate assets that may have incidentally affected the value of the corporate stock because such a claim "does not constitute a challenge to the regularity of the procedure by which the corporate reorganization was accomplished." *Id.* at 798. The court further concluded that Gannon could not sue for breach of the trust agreement because any alleged breach damaged only the corporation. *Id.* The court observed that a stockholder could recover damages for wrongs done to him individually, as opposed to the corporation, but only "where the *wrongdoer* violates a duty arising from contract or otherwise owing directly by him to the shareholder." *Id* (emphasis in original). Because Gannon failed to allege a personal cause of action and personal injury arising from certain acts by Baker, the court held Gannon could not re-

cover damages individually for those acts.[3] *Id.* at 798–99.

 Thus, under the holding in *Gannon,* Hoggett is entitled to sue for the fair value of his stock, plus any special damages for losses caused by any alleged fraud or irregularity in the merger transaction that affected the fair value of his stock. *See id.* at 799. Hoggett can also sue for wrongs done to him individually, provided they involve a violation of a "duty arising from contract or otherwise and owing directly to him." *See id.* at 798. However, Hoggett cannot sue for wrongful acts unconnected to the merger or for wrongs done to Telescan, simply because such acts may have incidentally affected the value of his corporate stock. *See id.* at 798–99.

Here, Hoggett alleged the merger between Telescan and DB was not only "unlawful," but also that appellees committed fraud and various other torts in connection with the merger. Specifically, Hoggett alleged: (1) Brown was not a director and therefore could not lawfully vote on the board resolution approving the merger plan and directing a vote by the shareholders; (2) appellees never told him of the merger until the board meeting approving it; and (3) the merger violated various provisions of the shareholders agreement. These claims of irregularity or fraud in the merger transaction are not barred by the exclusive remedy provision of article 5.12G. Thus, the trial court did not err in submitting them to the jury. Accordingly, we now address whether there were other grounds for the trial court to disregard the jury's findings.

### B. Brown's Authority

 In his first point of error, Hoggett contends the trial court erred in disregarding the jury's answer to question one that Brown was not a director of Telescan on February 10, 1986, the date upon which Telescan's board of directors approved the merger plan and directed a vote on the plan by the shareholders. Because the merger plan was approved by only a two-director

---

**3.** The court did hold that Gannon could personally sue Baker for allegedly converting Gannon's stock for personal use.

majority consisting of Brown and Carlin, the jury's answer to question one bears directly on the validity of the merger. *See* Tex. Bus. Corp. Act Ann. art. 5.01B (Vernon 1980) ("the board of directors of each corporation shall, by resolution adopted by each such board, approve a plan of merger ...").[4] The number of directors in a corporation is governed by article 2.32 of the Act, which provides in part:

> The number of directors shall be fixed by, or in the manner provided in, the articles of incorporation or the bylaws, except as to the number constituting the initial board of directors, which ... shall be fixed by the articles of incorporation. The number of directors may be increased or decreased from time to time by amendment to, or in the manner provided in, the articles of incorporation or the bylaws, but no decrease shall have the effect of shortening the term of an incumbent director. In the absence of a bylaw providing for the number of directors, the number of directors shall be the same as that provided for in the articles of incorporation.

Tex. Bus. Corp. Act Ann. art. 2.32 (Vernon 1980).

The articles of incorporation list Hoggett and Carlin as the initial directors. It is undisputed the number of directors was never increased to make Brown a director either by amendment to the articles or "in the manner provided in the bylaws."[5] The fact Brown was never made a director pursuant to the articles of incorporation and by-laws constitutes "some evidence" Brown was not a director. *See Alm*, 717 S.W.2d at 593. Therefore, the court should not have granted the motion to disregard this finding and point of error one is sustained.

However, by cross-point, appellees argue the great weight and preponderance of the evidence shows Hoggett, by his own words and conduct, treated Brown as a director.[6] The jury was instructed that Hoggett "may not claim that [Brown] was not a director of [Telescan] if you find that such claims by [Hoggett] are barred by waiver, estoppel, or laches." The jury was further instructed as follows:

> Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming a right.

> An estoppel occurs when a party has a duty to speak, but fails to do so, and that party's failure to speak is a misleading representation.

> Laches means that a party has unreasonably delayed in asserting his rights and another party has made a good faith

---

4. Appellees assert Brown's authority as director is immaterial because the necessary two-thirds of the shareholders ratified any defects in the merger procedure. *See* Tex. Bus. Corp. Act Ann. art. 5.03B (Vernon 1980). Ratification is an affirmative defense that must be pled. *Petroleum Anchor Equip. v. Tyra*, 419 S.W.2d 829, 834 (Tex. 1967). However, that defense was waived because appellees neither pled ratification nor was the issue tried by consent. *See id.* An issue may be deemed tried by consent when evidence upon the issue is developed under circumstances that the parties understand the issue is in the case and the other party fails to make an appropriate complaint. *Realtex Corp. v. Tyler*, 627 S.W.2d 441, 443 (Tex.App.—Houston [1st Dist.] 1981, no writ). To determine whether an issue was tried by consent, the court must examine the record, not for evidence of the issue, but rather for evidence of trial of the issue. *Stephanz v. Laird*, 846 S.W.2d 895, 901 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Here, the issue of ratification was only briefly mentioned by appellees' expert during the trial. Appellees neither argued this theory nor requested a jury question. On this record, we conclude the parties did not understand the issue of ratification was being tried. *See Stephanz*, 846 S.W.2d at 901; *Realtex*, 627 S.W.2d at 443.

5. Article III, section 1 of the Bylaws provides "the number of directors which shall constitute the entire Board of Directors shall be determined from time to time by resolution of the Board of Directors." It also provides "if the Board of Directors makes no such determination, the number of directors shall be the number set forth in the Articles of Incorporation." Section 8 further provides "any directorship ... filled by reason of an increase in the number of directors may be filled (i) by the Board of Directors for a term of office continuing only until the next election of one or more directors by the shareholders ... or (ii) by election at an annual or special meeting of shareholders called for that purpose."

6. Contrary to Hoggett's suggestion, appellees' citation to evidence in the record under their reply point concerning the director issue was sufficient to preserve their cross-point. *See* Tex.R.App. P. 74(d).

change of position to his detriment as a result of the delay.

■ Hoggett does not challenge these instructions, but relies on the legal conclusion of his corporate law expert that Brown could not be a director except as specifically provided by the articles of incorporation and bylaws. There is equal testimony from appellees' experts that Brown was a director because the other directors treated him as one. However, we are not bound by any of this expert testimony because the question of whether a director in a closely held corporation may be barred by equitable principles from challenging the authority of another to act as director is purely one of law.[7] *See Puente v. A.S.I. Signs,* 821 S.W.2d 400, 402 (Tex.App.—Corpus Christi 1992, writ denied) (holding that rules of evidence do not permit an expert to give opinion or state legal conclusions regarding a question of law).

■ Texas courts have applied equitable principles to notice requirements in situations where corporate control was at stake. *See Camp v. Shannon,* 162 Tex. 515, 348 S.W.2d 517, 520 (1961) (holding that corporate president who called, and participated in, shareholders meeting to elect directors was estopped from questioning the legality of the meeting and election of directors who later removed him); *R. H. Sanders Corp. v. Haves,* 541 S.W.2d 262, 265 (Tex.Civ.App.—Dallas 1976, no writ) (holding that voting agreement that did not comply with certain notice requirements of the Act was enforceable because all of the shareholders knew of the agreement and participated in the transaction in question); *Caldwell v. Kingsbery,* 451 S.W.2d 247, 250–51 (Tex.Civ.App.—Austin 1970, writ ref'd n.r.e.) (holding that corporate director waived any defect in notice of directors/shareholders meeting called to remove him as director where director attended and participated in the meeting without objection); *Been v. Producers Ass'n of San Antonio, Inc.,* 352 S.W.2d 292, 293 (Tex.Civ. App.—San Antonio 1961, no writ) (holding that ousted directors of marketing association who continually protested the legality of special shareholders meeting called to elect new directors did not waive their complaint). In light of these cases, we see no reason why one director, under proper facts, cannot be barred by waiver, estoppel, or laches from challenging another's authority to act as director. With those principles in mind, we now review whether the jury's finding that Brown was not a director is against the great weight and preponderance of the evidence.

In reviewing the factual sufficiency of the evidence, we must weigh and consider the evidence both in support of, and contrary to, the challenged findings. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We must uphold the jury's findings unless they are so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). Because Hoggett does not challenge the submission of question one or the accompanying definitions, we evaluate the evidence in light of the questions and instructions submitted to the jury. *See Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985).

The overwhelming evidence shows unequivocally that Hoggett, by his own words and conduct, considered Brown a director of Telescan:

(1) Hoggett signed under oath for Telescan two franchise tax returns that were filed with the Secretary of State and designated Brown as a director.[8]

(2) At the December 17, 1985, board meeting of Telescan attended by Hoggett, Carlin, Brown and corporate counsel Robert Vander Lyn, Hoggett expressed his belief that Vander Lyn would resign if all *"three*

---

7. Whether Brown was a *de facto* director presents a different question that is not at issue. The *de facto* director doctrine applies only to third parties who deal with the corporation and are unaware of the de facto director's true status. *Austin Lake Estates Recreation Club, Inc. v. Maberry,* 638 S.W.2d 649, 650 (Tex.App.—Austin 1982, writ ref'd n.r.e.).

8. Hoggett conceded he signed one of the franchise tax returns, but stated that someone else checked off the box designating Brown as a director.

*directors"* were unhappy with him as counsel;

(3) At the January 3, 1986, special board meeting of Telescan attended by Hoggett, Carlin, Brown and Vander Lyn:

(a) Hoggett complained that Carlin and Brown were talking to one another and stated that he had retained counsel "because of [the] "obvious practice of the *other members* of the board;"

(b) Brown specifically referred to himself as a *director* when he asked Hoggett about how the board was to resolve matters with Hoggett having retained counsel;

(c) Hoggett objected to being overruled on a matter by Carlin and Brown and complained that *"the other members of the board of Telescan"* denied him the right to counsel;

(d) Hoggett criticized Brown for failing to attend board meetings.

(4) At the January 7, 1986, special board meeting of Telescan attended by Hoggett, Carlin, Brown and Vander Lyn, Hoggett twice referred to Brown as a *"fellow director"* and referred to the *"other directors;"*

(5) Hoggett wrote a February 3, 1986, letter to both Carlin and Brown stating he intended to propose bankruptcy to the board.

(6) At the February 10, 1986, special board meeting of Telescan attended by Hoggett, Carlin, Brown and Vander Lyn:

(a) Hoggett objected to a loan to pay back taxes and spoke to Brown about their personal liability as directors for unpaid payroll taxes;

(b) Hoggett admonished Vander Lyn for interrupting while he was "interrogating *the rest of my board"* and reminded Vander Lyn that he was there, *"according to the other two directors,* as independent counsel;"

It was not until after the board approved the merger that Hoggett objected to Brown's authority as a director. Prior to that time, Hoggett never objected to Brown's authority, though he had numerous opportunities to do so. Indeed, the record reflects that Brown was regularly treated as a member of Teles-

can's board of directors and that the corporation acted accordingly without any objection by Hoggett or anyone else. Specifically, notices of board meetings were addressed to Brown as director. Minutes of board meetings listed Brown as director. Brown made motions, seconded motions, and voted at board meetings. In many cases, Brown's vote was decisive. In fact, Hoggett relied on Brown's vote as director when Brown twice voted to block Carlin's attempts to remove Hoggett as director. Brown also voted for, and signed, board resolutions and waivers of notice of board meetings. Hoggett has never complained that any of the corporate actions taken prior to the merger were illegal because Brown was not a director. Therefore, he cannot now complain the merger is illegal on the same ground.

Hoggett asserts appellees did not rely on his conduct to their detriment because they could have delayed the merger by the requisite number of days to formally elect Brown as director so that the merger plan could be validly approved. *See* TEX. BUS. CORP. ACT ANN. art. 5.03(A) (Vernon 1980) (requiring at least twenty days notice of shareholders meeting to consider merger). While relevant to the issue of laches, "detrimental reliance" is not an element of waiver and was omitted from the definition of estoppel submitted to the jury. *See Rogers v. Ricane Enterprises, Inc.,* 772 S.W.2d 76, 80 (Tex.1989); *see also Straus v. Kirby Court Corp.,* 909 S.W.2d 105, 108 (Tex.App.—Houston [14th Dist.] 1995, writ denied). While Hoggett objected to the definition of estoppel below, he does not complain about it on appeal. Therefore, we are bound by the definition submitted. *See Larson,* 690 S.W.2d at 568. In view of the charge submitted, Hoggett's prior conduct plainly amounts to a waiver or estoppel of Brown's authority as director. In any event, we fail to see how there was no detrimental reliance. At the time of the merger, the company was in financial crisis and any delay to hold a formal election for directors would, to say the least, have not been in the company's best interest. Even if appellees could have delayed the merger, they were justified in believing that such an election was unnecessary in light of the fact that Hoggett had

never complained about Brown's authority or the legality of any corporate actions taken prior to the merger.

Hoggett also asserts Brown was simply the director of the limited partnership through which Telescan ran its business or merely an advisory director of Telescan. There is no evidence to support these assertions other than Hoggett's testimony that he believed these facts to be true at the time. According to Hoggett, he mistakenly thought a limited partnership had a board of directors despite the fact he raised money for limited partnerships for a living and was familiar with this business form. Plainly, this evidence is factually insufficient in light of the overwhelming evidence of Hoggett's prior conduct treating Brown as director of Telescan. Based on that evidence, we conclude that Hoggett was barred by principles of waiver and estoppel from claiming Brown was not a director and that the jury's finding otherwise is so against the great weight and preponderance of the evidence as to be manifestly unjust. Cross-point one is sustained.

## C. Fraud

In his second point of error, Hoggett contends the trial court erred in disregarding the jury's answer to question five that Brown committed fraud "in connection with the merger." In his fourth and fifth points of error, Hoggett also contends the trial court erred in disregarding the jury's award of actual and punitive damages for fraud. The jury was instructed as follows:

Fraud occurs when:

a. party conceals or fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the facts and does not have an equal opportunity to discover the truth,

c. the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

■ In his petition, Hoggett alleged appellees committed fraud by failing to disclose "the material facts of their plan to divest him of his interest and participation [in Telescan and Telescan Ltd.] by way of the merger."[9] At trial, Hoggett contended Brown failed to disclose the merger plan to him in advance of the February 10, 1986, board of directors meeting called to consider the plan.[10] According to Hoggett, Brown, his attorney, and the other shareholders formulated the merger plan back in December 1985, but kept it secret from him. There is no dispute the merger plan excluded Hoggett from the new company and Brown knew of the plan in advance of the February 10, 1986, directors' meeting, but did not disclose it to Hoggett beforehand. A merger or sale of assets that results in a "freeze out" of a shareholder is permitted by law, provided the transaction is properly approved by the requisite number of shareholders. *See Farnsworth v. Massey*, 365 S.W.2d 1, 5 (Tex.1963). The question here is whether Brown or the other appellees had a duty to disclose the merger before the board of directors meeting called to consider it.

Appellees argue Brown had no obligation under the Act or corporate bylaws to inform Hoggett of the purpose of the board meeting. Article 2.37 of the Act states "neither the business to be transacted ... nor the purpose of, any regular or special meeting of the board of directors need be specified in the notice ... of such meeting, unless required by the bylaws." TEX. BUS. & COM.CODE ANN. art. 2.37 (Vernon 1980). Article III, section 5 of the Telescan bylaws does not even require

---

9. Hoggett also alleged that appellees misrepresented, or gave certain warranties about, Brown's business acumen. However, there is nothing the record to support this claim. In fact, the record shows that it was Brown who requested a letter of warranty and certain representations from Hoggett and Carlin about the company and its product before he invested. Hoggett admitted he made no similar request of Brown.

10. As we described, the merger plan called for Brown, Carlin and Wadsworth to participate as directors and/or officers in the new company. As part of his fraud claim at trial, Hoggett asserted Brown should have disclosed this information as well.

notice of a regular board of directors meeting. While section 6 of that same article requires twenty-four hours written notice of a special board of directors meeting, it specifically states that such notice "need not state the purpose or purposes of such meeting." Clearly, neither the Act nor Telescan bylaws require notice of the purpose of board meetings. However, to say this negates any duty on Brown's part is an oversimplification.

■ Here, the jury was asked to determine the existence of fraud by nondisclosure. For there to be actionable nondisclosure fraud, there must be a duty to disclose. *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633–36 (Tex.App.—San Antonio 1993, writ denied). Whether such a duty exists is "entirely a question of law." *Id.* at 633. A duty to disclose may arise in four situations: (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression. *Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, 941 S.W.2d 138, 146–47 (Tex.App.—Corpus Christi, 1995), *rev'd on other grounds*, 960 S.W.2d 41 (1997); *Ralston Purina*, 850 S.W.2d at 635–36.

■ Hoggett suggests that Brown had a duty to disclose the merger plan during board meetings in December 1985, and January 1986, when Brown assured him that he had no interest in changing or taking Hoggett's ownership interest in the company. According to Hoggett, Brown and his attorney had already formulated a merger plan that excluded Hoggett from the new company. Taken in context, Brown's statements do not give not give rise to fraud. In the December board meeting, Brown was simply responding to Hoggett's proposal to put the company in bankruptcy. Brown's concern was that bankruptcy would either force him to purchase the Western Bank note or result in a foreclosure on the company's assets. In the January board meeting, Brown was addressing corporate counsel's concern that personal conflicts would interfere with the company's attempts to obtain third-party financing. Brown's statements had nothing to do with any planned merger. More importantly, the uncontroverted evidence was that Brown's attorney suggested the possibility of a merger in December 1985, but that no plan was discussed or implemented until early February 1986, when Hoggett threatened to take the company into bankruptcy. Clearly, Brown's statements at the earlier board meetings did not give rise to a duty to disclose.

■ Because Hoggett does not claim any other statements as a basis for a duty to disclose, Brown is not liable for fraud based on nondisclosure unless, as Hoggett claims, a fiduciary relationship existed between he and Brown. There are two types of fiduciary relationships—a formal fiduciary relationship that arises as a matter of law, such as principal/agent or partners, and an informal fiduciary relationship arising from a confidential relationship "where one person trusts in and relies upon another, whether the relation is moral social, domestic or merely personal." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593–94 (Tex. 1992); *Hallmark v. Port/Cooper*, 907 S.W.2d 586, 592 (Tex.App.—Corpus Christi 1995, no writ). A fiduciary duty requires the fiduciary to place the interest of the other party before his or her own. *Id.* Thus, where a fiduciary relationship exists, the burden is upon the fiduciary to show he acted fairly and informed the other party of all material facts relating to the challenged transaction. *Brazosport Bank v. Oak Park Townhouses*, 889 S.W.2d 676, 684 (Tex.App.—Houston [14th Dist.] 1994, writ denied).

■ No formal fiduciary relationship existed between Brown and Hoggett. Brown and Hoggett were not partners. Brown was a limited partner in Telescan, Ltd. and Hoggett merely an employee of the limited partnership.[11] Brown and Hoggett were both

11. Hoggett was a party to the limited partnership agreement solely for the noncompetition agreement contained therein.

directors and shareholders of Telescan.[12] A director's fiduciary duty runs only to the corporation, not to individual shareholders or even to a majority of the shareholders. *Gearhart Indus., Inc. v. Smith Int'l Inc.,* 741 F.2d 707, 721 (5th Cir.1984); *Schautteet v. Chester State Bank,* 707 F.Supp. 885, 888 (E.D.Tex.1988). Similarly, a co-shareholder in a closely held corporation does not as a matter of law owe a fiduciary duty to his co-shareholder.[13] *Kaspar v. Thorne,* 755 S.W.2d 151, 155 (Tex.App.—Dallas 1988, no writ); *Schoellkopf v. Pledger,* 739 S.W.2d 914, 920 (Tex.App.—Dallas 1987), *rev'd on other grounds,* 762 S.W.2d 145 (Tex.1988). Instead, whether such a duty exists depends on the circumstances. *Kaspar,* 755 S.W.2d at 155; *Schoellkopf,* 739 S.W.2d at 920. For example, if a confidential relationship exists.

While the existence of a confidential relationship is ordinarily a question of fact for the jury, it becomes a question of law when, as in this case, the trial court disregarded findings on fraud and refused to submit issues on fiduciary duty based on "no evidence." *Crim Truck,* 823 S.W.2d at 594; *Kaspar,* 755 S.W.2d at 155. A confidential relationship exists where influence has been acquired and abused, and confidence has been reposed and betrayed. *Crim Truck,* 823 S.W.2d at 594. A person is justified in placing confidence in the belief that another party will act in his or her best interest only where he or she is accustomed to being guided by the judgment or advice of the other party, and there exists a long association in a business relationship, as well as personal friendship. *Dominguez v. Brackey*

*Enterprises, Inc.,* 756 S.W.2d 788, 791–92 (Tex.App.—El Paso 1988, writ denied). However, the fact that the relationship has been a cordial one, of long duration does not necessarily constitute a confidential relationship. *Crim Truck,* 823 S.W.2d at 594; *Hallmark,* 907 S.W.2d at 592. A fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not alone indicate that confidence is placed in another in the sense demanded by fiduciary relationships because something apart from the transaction between the parties is required. *Kline v. O'Quinn,* 874 S.W.2d 776, 786 (Tex. App.—Houston [14th Dist.] 1994 writ denied), *cert denied,* 515 U.S. 1142, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995).

The record reflects that the relationship between Brown and Hoggett was anything but one of confidence and trust. Brown characterized his relationship with Hoggett from June 1984, to December 1985, as "quite good ... warm and cordial to confrontational." The negotiations culminating in Brown's entry into the business, including the terms of the shareholders and limited partnership agreements, were conducted at "arms length," with each party represented by counsel. This was a recurring theme throughout the short, but troubled, history of the company as both Brown and Hoggett repeatedly sought the advice of counsel on various corporate matters. There are numerous references in the record to ongoing disputes between Brown and Hoggett concerning the nature of Brown's financial con-

**12.** Brown owned almost 2% less of the company than Hoggett because of the commission Brown paid to WK.

**13.** We note that a majority shareholder's fiduciary duty ordinarily runs to the corporation. *Schautteet,* 707 F.Supp. at 889. However, in certain limited circumstances, a majority shareholder who dominates control over the business may owe such a duty to the minority shareholder. *See e.g., Patton v. Nicholas,* 154 Tex. 385, 279 S.W.2d 848 (1955) (injunction issued against majority shareholder maliciously suppressed dividends); *Davis v. Sheerin,* 754 S.W.2d 375 (Tex. App.—Houston [1st Dist.] 1988, writ denied) (court-ordered buy-out of minority shareholder where majority shareholder engaged in oppressive conduct); *Duncan v. Lichtenberger,* 671

S.W.2d 948 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.) (minority shareholders entitled to reimbursement of monetary contribution to corporation where majority shareholder completely excluded minority shareholders from management of business); *Thompson v. Hambrick,* 508 S.W.2d 949 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.) (fact issue existed as to whether majority shareholders wrongfully obtained premium for selling control of the corporation) *Morrison v. St. Anthony Hotel,* 295 S.W.2d 246 (Tex. Civ.App.—San Antonio 1956, writ ref'd n.r.e.) (former minority shareholder entitled to sue majority shareholder for malicious suppression of dividends). None of these circumstances are present because Brown was never a controlling shareholder of the corporation.

tributions to the company (i.e., as either capital or loans) and whether those contributions triggered default under the amended limited partnership agreement, the company's expenditures, the amount of corporate debt, and the liability for that debt. Far from relying on Brown's business expertise, Hoggett was suspicious and mistrustful of Brown's motives toward the company. As a result, he not only attempted to buy out Brown's interest, but also threatened to put the company in bankruptcy or to sue Brown for "racketeering." These threats in turn caused Brown to be hesitant about contributing funds without an increased stake in ownership of the company, which at the time of the merger was indisputably in need of capital to pay its debts. This being the state of affairs at the time of the merger, there could be no confidential relationship giving rise a duty to disclose.

In the absence of a fiduciary relationship, either formal or informal, Brown simply had no duty to disclose the merger plan to Hoggett prior to the February 10, 1986 board meeting.[14] Without a duty to disclose on the part of Brown, the trial court should not have submitted the fraud issue to the jury and properly disregarded the jury's finding. Accordingly, the trial court also properly disregarded the jury's answers to questions six and eight regarding Hoggett's fraud damages. Points of error two, four and five are overruled. Having overruled Hoggett's points of error on fraud, we need not address appellees' conditional cross-points two through four challenging the jury's award of fraud damages or conditional cross-point five complaining that the jury's fraud finding was "tainted" by incurable jury argument.

### D. The 80% Voting Provision

■ In his eighth point of error, Hoggett contends the trial court erred in refusing to disregard the jury's answer to question two that Brown waived the 80% voting provision of section 4.4 of the shareholders agreement. Hoggett first argues this question is immaterial because Brown was not a director and therefore, the merger was invalid regardless of section 4.4. As we discussed, Hoggett waived, or was estopped to assert, any claim that Brown was not a director. Hoggett also argues there is no evidence Brown waived section 4.4 in a writing signed by the shareholders and the corporation as required by section 4.10 of the shareholders agreement. Although there is uncontroverted testimony that Brown signed a document waiving section 4.4, no such document signed by Brown and the other shareholders was produced at trial. Thus, the trial court erred in refusing to disregard this finding. The trial court should have disregarded this finding for another reason as well.

Section 4.4 of the shareholders agreement provided as follows:

> *Amendment of Articles of Incorporation.* The Shareholders agree that they shall cause the Articles of Incorporation to be amended prior to June 15, 1984, to provide any action which, under the Texas Business Corporation Act and the existing Articles of Incorporation, would require the vote of at least sixty and two-thirds percent (66 2/3%) of the Shareholders shall hereafter require the vote of eighty percent (80%) of said Shareholders.

In other words, the shareholders agreed that any corporate action normally requiring the approval of only two-thirds of the shareholders under the Act—such as a merger—would, after amendment to the articles, require approval of 80% of the shareholders. The uncontroverted evidence establishes that the articles of incorporation were never amended as expressly required by section 4.4. As a result, that provision never took effect by its unambiguous terms and there

---

14. Assuming there was a duty to disclose, we fail to see what Hoggett would have done differently had Brown or the other appellees disclosed the merger plan before the board of directors meeting. Hoggett testified that if he had known before the meeting that the merger excluded him from participation in the new company, he would have accepted Brown's offer to contribute

$250,000 to the company in return for a majority stake in the company. Hoggett had the opportunity to review the merger plan with counsel before the shareholders vote. Yet, he never agreed to accept Brown's offer nor did he try to avoid the merger by seeking an injunction, the appointment of a receiver or filing for bankruptcy.

was nothing for Brown to waive.[15] The fact that corporate law experts for both sides testified to the contrary does not make it so. This is especially true in light of section 4.10, which declared the shareholders agreement to be the "entire agreement' of the parties and prohibited any "waiver, alteration or modification" without a writing "signed by the shareholders and the corporation." Because the articles of incorporation were never amended to enact section 4.4, the merger needed approval of only two-thirds of the shareholders, a requirement the evidence conclusively shows was satisfied.[16] Thus, the question of waiver is immaterial and should not have been submitted. However, the fact the question was submitted does not require reversal or modification of the judgment.

■ Submission of an immaterial issue is not harmful error unless the submission confused or misled the jury. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995). When determining whether a particular question could have confused or misled the jury, we consider its probable effect on the minds of the jury in light of the charge as a whole. *Id.* Based on the evidence submitted and the charge as a whole, we find nothing confusing or misleading about the submission of question two. Despite the entirely superfluous expert testimony on the validity of section 4.4, the waiver issue was merely an alternate ground for invalidating the merger. The jury found in Hoggett's favor on the other grounds, i.e., Brown's authority as director and fraud. Thus, neither an affirmative nor negative answer to question two would have altered the effect of the verdict insofar as the validity of the merger is concerned. Accordingly,

we hold that any error in submitting question two was harmless. *See* Tex.R.App. P. 81(b)(1). Point of error eight is overruled.

### E. Damages for the Value of Stock and Attorney's Fees

In his sixth point of error, Hoggett contends the trial court erred in disregarding the jury's answer to question four that Hoggett was entitled to $250,000 each from Brown and Carlin for "the reasonable value of his stock at the time of the merger." In his seventh point of error, Hoggett contends the trial court erred in disregarding the jury's award of attorney's fees, which was predicated on their affirmative answer to question four. In answer to question seven, the jury awarded Hoggett 40% of his recovery as trial attorney's fees and 5% of his recovery as appellate attorney's fees.

Hoggett contends the jury's finding in question four are contract damages. According to Hoggett, the trial court submitted only a damage question on breach of contract because it had already determined as a matter of law that appellees breached the shareholders agreement. Hoggett's contention is simply not supported by the record. The evidence conclusively establishes that the merger did not breach any of the provisions of the shareholders agreement. Moreover, there is nothing in the record to suggest that the jury's finding is based on breach of contract or any other claim. Accordingly, the trial court properly disregarded the jury's answer to question four on the reasonable value of Hoggett's stock at the time of the merger and question seven on attorney's

15. Although there is evidence that Brown recovered his investment, thereby, necessitating the removal of section 4.4, there is no evidence that the articles were again amended to "effectuate the removal" of the 80% voting requirement as contemplated by section 4.6 of the shareholders agreement.

16. Hoggett also alleges the merger violated the right of first refusal and anti-dilution provisions of the shareholders agreement. These issues were not separately submitted to the jury. Assuming they were subsumed in Hoggett's fraud claim, there is no evidence the merger violated these provisions of the shareholders agreement.

Section 2.1 of the shareholders agreement required a shareholder to first offer his shares to the corporation and other shareholders before selling those shares to a third-party. Section 4.3 prohibited any shareholder's ownership interest from being reduced or diluted without his consent. Neither of these provisions were violated by the merger because the shares in the nonsurviving corporation, Telescan, were extinguished. Hoggett's ownership interest was not transferred or diluted. Rather, Telescan's shares were cancelled and each shareholder received the same *pro rata* earnout from the net profits of the new corporation.

fees. Points of error six and seven are over-ruled.

## IV. THE SUBMISSION OF OTHER CLAIMS

■ In points of error nine through thirteen, Hoggett contends the trial erred in refusing to submit additional claims for fraud, breach of fiduciary duty, conspiracy, tortious interference, and breach of contract against Brown and/or the other appellees.[17] Texas Rule of Civil Procedure 278 declares that "the court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence." This rule provides a substantive, non-disretionary directive to trial courts requiring them to submit requested questions to the jury if the pleadings and any evidence support them. *See Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992). To determine whether there is legally sufficient evidence to support the submission of an issue, we must examine the record for evidence supporting the issue and ignore all evidence to the contrary. *Id.* A trial court may refuse to submit an issue only if no evidence exists to warrant its submission. *Id.*

### A. Fraud

■ Although it submitted a fraud issue as to Brown, the trial court refused separate issues as to Carlin, Wadsworth, Brown's sons, WK, and Telescan. While the evidence shows that Carlin, Wadsworth, and Brown's sons did not learn of the merger plan or their participation in the new company until shortly before the February 10th board of directors meeting, Hoggett asserts they should have disclosed this information beforehand. Because a corporation can only act through its officers or agents, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts. *See Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex.1995); *Paramount Nat'l Life Ins. Co. v. Williams*, 772 S.W.2d 255, 262 (Tex.App.—Houston [14th Dist.] 1989, writ denied).

Similarly, as a general rule, each partner is an agent of the partnership and is empowered to bind the partnership in the normal conduct of its business. *See* TEX.REV.CIV. STAT. ANN. art. 6132b § 9 (Vernon 1970), *amended by* Act of June 19, 1993; 73rd Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. 3887, 3892 (effective January 1, 1994) (current version TEX.REV.CIV. STAT. ANN. art. 6132b-3.02 (Vernon Supp.1997)). Thus, the liability of Telescan or WK depends solely on the conduct of their respective agents.

As we recognized, there cannot be actionable nondisclosure fraud in the absence of a duty to disclose. *See Ralston Purina*, 850 S.W.2d at 633–36. Furthermore, on the facts of this case, a duty to disclose could only have arisen from the existence of a formal or informal fiduciary relationship. *Formosa Plastics*, 941 S.W.2d at 146–47; *Ralston Purina*, 850 S.W.2d at 635–36. Like Brown, none of the other appellees, as a fellow director and/or shareholder, owed a formal fiduciary duty to Hoggett. *See Schautteet*, 707 F.Supp. at 888; *see also Kaspar*, 755 S.W.2d at 155. Furthermore, the evidence conclusively establishes the absence of a confidential relationship giving rise to a duty to disclose on the part any of the other appellees.

At Telescan's inception, Carlin and Hoggett were "good friends." Carlin relied on Hoggett's general business knowledge and Hoggett relied on Carlin's computer expertise. However, after Brown invested in the company, their relationship became increasingly one of mistrust and acrimony. These facts clearly do not support the existence of a confidential relationship giving rise to a duty to disclose.

Similarly, there is no evidence of a confidential relationship existing between Hoggett and Wadsworth. Because they were both in the investment business, Hoggett knew Wadsworth and approached him in late 1983 and early 1984 about investing in Telescan. Wadsworth decided not to invest, but recommended Brown. Wadsworth had helped Brown raise capital for Brown's company,

---

**17.** Because Brown owned the Telescan shares as trustee for his children, Hoggett requested issues separately for Brown individually and as trustee.

The distinction was apparently to differentiate between Brown as director and as shareholder.

Time Energy, and knew Brown had computer knowledge and financial resources. Wadsworth was not involved in the negotiations that resulted in Brown's participation in Telescan, but simply received Telescan stock as a commission for bringing the parties together. Wadsworth's general partnership, WK, received 24 shares of Telescan stock or a 1 2/3% interest. Although characterized by Hoggett as Brown's "right-hand man," Wadsworth was never an officer, director or shareholder of Telescan nor did he otherwise participate in the day-to-day management of that company. While Wadsworth attended the first two board of directors meetings of Telescan, he did so only to assist the company in finding a suitable lease and to help Brown "mend fences" between Hoggett and Carlin. Wadsworth also later helped Hoggett and Carlin close the Western Bank loan. Clearly, no relationship of trust and confidence existed between Hoggett and Wadsworth.

As for Brown's sons, there is simply no evidence in the record that they had any kind of relationship with Hoggett, other than as fellow shareholders. Because no fiduciary relationship, formal or informal, existed between Hoggett and the other appellees, there was no obligation to disclose the merger plan in advance of the February 10th board meeting and the trial court properly refused to submit Hoggett's proposed fraud issues to the jury.

## B. Tortious Interference

■ The trial court also refused to submit issues on whether Brown, individually, Wadsworth, and DB tortiously interfered with the Telescan shareholders agreement.[18] Pointing out that Brown formed DB solely to merge with Telescan, Hoggett asserts that Brown and Wadsworth, as directors of DB, "prevented the performance of the shareholders agreement, including the anti-dilution provision section 4.4 (80% vote requirement)."

■ Texas jurisprudence has long recognized that a party to a contract has a cause of action for tortious interference against any third person (a stranger to the contract) who wrongly induces another contracting party to breach the contract. *Holloway*, 898 S.W.2d at 794–95. By definition the person who induces the breach cannot be a contracting party. *Id.* at 795. The parties to the shareholders agreement were Telescan, Hoggett, Carlin, Brown, as trustee, Carlin, and WK. Brown, individually, was not only a director of DB, but also a director of Telescan, a party to the shareholders agreement. Similarly, Wadsworth was a director of DB and 50% partner of WK, also a party to the shareholders agreement.

■ One of the elements of tortious interference with a contract is the occurrence of an act of interference that was willful and intentional. *Id.* Where, as here, the defendant serves the dual roles as corporate agent and the third-party who allegedly induced the breach, the plaintiff must show that the defendant acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests. *Id.* at 796. In other words, a corporate officer or director may not be held liable for inducing the corporation to violate a contractual obligation as long as he or she acts in good faith on the corporation's behalf. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 432 (1997).

■ A corporate officer's potential gain is not determinative. *Id.* Inasmuch as it is the duty of corporate officers to protect the interests of the corporation, the mere existence of a personal stake in the outcome, especially when any personal benefit is derivative of the improved financial condition of the corporation, cannot alone constitute proof that the defendant committed an act of willful or intentional interference. *Holloway*, 898 S.W.2d at 796. Because a partner, like a corporate officer or director, is an agent of the partnership, we see no reason why these rules cannot be equally applied to a partner who allegedly induced the breach of the partnership's contract.

---

18. Relying on *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203 (Tex.1996), appellees suggest any interference was justified. However, appellees failed to properly plead this affirmative defense.

*See* Tex R. Civ. P. 94 (Vernon 1979). Appellees pled justification, but only as a defense to tortious interference with prospective contractual relations.

In this case, the alleged act of interference is the merger. Given the company's state of affairs at the time, there can be no doubt that the merger was in Telescan's best interest. The purpose of the merger was not only to lawfully remove a disruptive shareholder, but to infuse badly needed capital. As we discussed, the merger did not dilute any shareholder's interest nor require approval of 80% of the shareholders. Brown, Carlin, Wadsworth, and Lance Farrell, all testified that Telescan would have gone out business without an infusion of capital. Their expert, Robert Marsh, also testified that Telescan's debts at the time of the merger exceeded the value of its assets by approximately $1.2 million and the company had no value. On the other hand, Hoggett testified that Telescan's debt would not have "killed" the company. Hoggett reasoned that accounts receivable were on the increase, Brown overstated the company's debt, and most of that debt was owed to Brown and Investa. Hoggett's expert, Jason Worth, also estimated that the 1986 value of the company was between $3.1 and $5.2 million.

Assuming the company had value and was not about to go out of business, there is no dispute the company needed immediate capital to pay its accounts payable, most notably, the long distance carrier who connected Telescan's service to its customers. However, given the disputes within the company, Brown was unwilling to provide additional funds without increased equity. Hoggett, on the other hand, refused to accept any further contributions from Brown that would have reduced his equity. Unable to obtain any third-party loans, and with Hoggett refusing to accept Brown's help at all and also threatening litigation, Telescan was without a source of capital to pay its debts. Although Hoggett indicated he had investors in his buyout offer to Brown, those investors were never identified.

In merging Telescan into his own company, Brown was able to invest as much capital as the company needed while maintaining equity that was commensurate with his risk. By contrast, Brown's risk associated with Telescan, whether in the form of loan guarantees or capital, always exceeded his equity.

Even with Brown's infusion of capital, the new company still lost money. While Brown ultimately profited when the company later became successful, those circumstances are insufficient, as a matter of law, to establish a willful and intentional interference of the company's contract with its shareholders. *See Holloway*, 898 S.W.2d at 796. Likewise, there was no willful and intentional interference by Wadsworth with the partnership's contract with the other shareholders. There is no evidence that Wadsworth benefited at the partnership's expense by voting WK's shares in favor of the merger. Although Wadsworth later became a shareholder and president of both DB and Max Ret, there is nothing in the record to suggest that WK was affected one way or the other by the merger. WK simply pledged the earnout certificate as collateral for a loan previously secured by its Telescan stock. Because there was not a willful and intentional interference by Brown or Wadsworth, there could be no interference by DB, *see Holloway*, 898 S.W.2d at 795, and the trial court properly refused to submit Hoggett's proposed issues to the jury.

## C. Breach of Fiduciary Duty, Breach of Contract, and Conspiracy

The trial court further refused to submit issues on breach of fiduciary duty and conspiracy to breach a fiduciary duty by Brown, Carlin and Wadsworth. Conspiracy is a derivative tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996). That is, a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of named defendants liable. *Id.* Because we have already determined Brown, Carlin and Wadsworth owed no fiduciary duty to Hoggett, there could not be a conspiracy. For the same reason, the trial court also properly refused to submit issues on breach of contract and conspiracy to breach a contract by Brown, Carlin, WK, and Telescan. Having determined that the merger did not violate the shareholders agreement, there could be no conspiracy. *Id.* Points nine through thirteen are overruled.

## V. CONSTRUCTIVE TRUST

■ In point of error three, Hoggett contends the trial court erred in refusing to impose a constructive trust. In his motion for judgment, Hoggett requested the court to impose a constructive trust based on actual fraud and breach of fiduciary duty. Hoggett also claimed appellees were unjustly enriched by an invalid merger. The equitable remedy of constructive trust is broad and flexible. *Newman v. Link,* 866 S.W.2d 721, 725 (Tex. App.—Houston [14th Dist.] 1993), *writ denied,* 889 S.W.2d 288 (Tex.1994). "It is imposed by law because the person holding title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property." *Id.* (quoting *Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401, 405 (1960)). "A transaction may, depending on the circumstances, provide the basis for a constructive trust where one party to that transaction holds funds which in good conscience should be possessed by another." *Meadows v. Bierschwale,* 516 S.W.2d 125, 131 (Tex.1974).

■ A constructive trust is also available as a remedy for constructive fraud based on breach of a fiduciary duty or actual fraud. *Newman,* 866 S.W.2d at 725–26; *Grace v. Zimmerman,* 853 S.W.2d 92, 97 (Tex.App.—Houston [14th Dist.] 1993, no writ). Because it is an equitable remedy, a court has discretion whether to impose a constructive trust. *See Stephens v. Stephens,* 877 S.W.2d 801, 804 (Tex.App.—Waco 1994, writ denied). The merger was not invalid nor was there breach of a fiduciary duty or actual fraud. Thus, the trial court properly refused to impose a constructive trust. Point of error three is overruled.

## VI. RULE 279

■ In point of error fourteen, Hoggett contends the trial court erred in finding that the earn-out certificates had value. In their Motion For Judgment, To Disregard Jury findings And "For Rule 279 . . . Findings," appellees asserted that Hoggett's sole remedy for the merger was the earnout certificate because Hoggett neither followed the procedure under article 5.12 nor proved fraud. Appellees asserted the value of each certifi-cate was $100,000 and requested the court to make a finding to that effect pursuant to Texas Rule of Civil Procedure 279. In the final judgment, the court found the earn-out certificates had value, but did not place a value on the certificates.

Hoggett contends the court was not authorized to make this finding under Rule 279 because the evidence does not support it and the defense of "sole remedy" was never submitted to the jury. The court's finding was merely evidentiary and had no effect on the parties' legal obligations. The court did not determine the value of the certificates nor did it rule that the certificate was Hoggett's sole remedy. Thus, the court's finding, if error, was harmless. TEX.R.APP. P. 81(b)(1). Point of error fourteen is overruled.

## VII. ATTORNEY'S FEES

■ In point of error fifteen, Hoggett contends the trial court erred in awarding attorney's fees incurred by appellees in defense of Hoggett's declaratory judgment action. In the first trial, the trial court awarded appellees $25,000 in attorney's fees. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997). As we noted, this court remanded the issue of attorney's fees to the trial court. On remand, the trial court reconsidered the attorney's fees issue and reduced the award to $13,600 for defense of Hoggett's declaratory judgment action. Hoggett contends the trial court abused its discretion in awarding attorney's fees because the only evidence presented by appellees was of attorney's fees incurred after Hoggett had abandoned his declaratory judgment action in January 1994, prior to the second trial.

■ The grant or denial of attorney's fees in a declaratory judgment action lies within the discretion of the trial court and its judgment will not be reversed on appeal absent a clear showing that it abused its discretion. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985). Testifying on the issue of attorney's fees for appellees, Telescan's counsel stated it was necessary to defend Hoggett's declaratory judgment action even though Hoggett abandoned it be-

fore trial. However, he acknowledged that billings to his client after January 1994, may not have been related to Hoggett's declaratory judgment action. Appellees offered into evidence bills from their attorneys covering periods before and after the Hoggett abandoned his declaratory judgment claim. Of those bills, only the ones to Telescan and Carlin specifically segregate services rendered before January 1994. The total amount billed for those services is approximately $13,000, almost the exact amount awarded by the court. Telescan's counsel also testified that a portion of $30,000 billed to his client in January 1994, were probably for services rendered in the previous months—before Hoggett abandoned his declaratory judgment action. Based on this evidence, we cannot say the trial court abused its discretion in awarding attorney's fees. *See Oake*, 692 S.W.2d at 455. Point of error fifteen is overruled.

## VIII. RECUSAL

■ In points of error sixteen and seventeen, Hoggett contends the denial of his post-verdict motion to recuse was an abuse of discretion. Initially, we recognize that a post-verdict motion to recuse is proper where, as here, the party seeking recusal claims he did not know the basis for recusal until after the completion of the trial. *Sun Exploration and Prod. Co. v. Jackson*, 783 S.W.2d 202, 206 (Tex.1989) (J. Spears concurring); *Kirby v. Chapman*, 917 S.W.2d 902, 910 (Tex.App.—Fort Worth 1996, no writ). The day after Hoggett filed his motion, the trial judge signed an order refusing to recuse himself and the matter was referred to the presiding judge of the judicial administrative district. *See* TEX.R. CIV. P. 18a(d) (Vernon Supp.1997). Hoggett objected twice to the judges assigned before settling on a third judge. In the interim, Hoggett filed a supplemental motion to recuse attaching the affidavits of two jurors. Hoggett's motions were denied after a hearing before this third assigned judge. *See id.*

■ A judge's refusal to recuse is viewed on appeal by an abuse of discretion standard. TEX.R. CIV. P. 18a(f); *Gulf Maritime Warehouse Co. v. Towers*, 858 S.W.2d 556, 558 (Tex.App.—Beaumont 1993, writ denied). Hoggett contends the judge's conduct during the trial raises questions about the judge's impartiality and shows prejudice against him. *See* TEX.R. CIV. P. 18(b)(2)(a), (b) (Vernon Supp.1997). In support of this contention, Hoggett relies on various record excerpts and affidavits attached to his motion and supplemental motion. Even though we are dealing with a "cold" appellate record, we have reviewed the entire trial and cannot discern the bias claimed by Hoggett.

■ Public policy demands that a judge who tries a case act with absolute impartiality. *CNA Ins. Co. v. Scheffey*, 828 S.W.2d 785, 792 (Tex.App.—Texarkana 1992, writ denied). A judge should be fair and impartial and not act as an advocate for any party nor should he be any party's adversary. *Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex.App.—Houston [1st Dist.] 1994, writ denied) (addressing the question of whether trial judge's conduct or comments deprived party of fair trial). Judicial decisions rendered under circumstances that suggest bias, prejudice or favoritism undermine the integrity of the courts, breed skepticism and mistrust, and thwart the principles on which the judicial system is based. *CNA Ins.*, 828 S.W.2d at 792.

■ However, every trial court has the "inherent power" to control the disposition of the cases on its docket, "with economy of time and effort for itself, for counsel, and for litigants." *Metzger*, 892 S.W.2d at 38 (citing *Landis v. North Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153(1936)). In Texas, the court's "inherent power" together with applicable rules of procedure and evidence accord judges broad, but not unfettered, discretion in handling trials. *Metzger*, 892 S.W.2d at 38. The judge is responsible for the general conduct and management of the trial. *Id.* In fulfilling this responsibility, the court has discretion in expressing itself while managing the trial. *Id.* The judge may properly intervene in the proceedings to maintain control and promote expedition. *Id.* The judge should, however, refrain from verbally confronting or displaying displeasure toward counsel, particularly in the presence of the jury. *Id.* During trial,

the judge should not make unnecessary comments or remarks that may result in prejudice to a litigant. *Id.* The lawyers and parties have a corresponding duty not to engage in behavior likely to invoke proper admonishment from the court. *Id.* at 39.

▪ Here, the trial judge was obviously annoyed about having to conduct a retrial. However, as borne out by the record excerpts cited by Hoggett, the judge's annoyance was not so much directed toward the plaintiffs or to the merits of their case, as to his desire to expedite the proceedings and avoid reversible error a second time. For instance, when the trial judge criticized this court's prior decision, he was not expressing an opinion on the merits of the plaintiffs' case. Rather, the judge's concern was merely with avoiding another reversal based on alleged improper expert testimony being elicited by Investa's counsel. In fact, the judge ruled in favor of plaintiffs, stating he was inclined "to let everything in." Likewise, the judge was again worried about reversal, when he voiced concern about the number of jury issues being requested by the plaintiffs. Although the judge expressed doubt about whether every issue had merit, he again ruled for the plaintiffs, stating he was going "to give the plaintiff [sic] all they want" and denying appellees' motion for directed verdict.

In addition, the judge admonished Hoggett's counsel to be "specific" when questioning a witness about fraud on Telescan's customers simply to expedite matters. That issue had not only been raised during previous testimony, but was not a cause of action alleged by the plaintiffs. Similarly, the judge threatened to stop the trial and never retry the case only after counsel began accusing each other of violating the motion in limine. These comments were directed to counsel for both sides to speed up the case.

▪ However, there is conduct cited by Hoggett that is cause for concern. For instance, the trial judge commented that Hoggett's counsel was attempting to perpetrate a "hoax" on the court. That comment came when counsel pointed out to a witness that the amended limited partnership agreement did not refer to Brown as a director. While we do not condone the judge's choice of words, the judge explained that his comments referred to Hoggett's mistaken assertion that Brown was the director of the limited partnership rather than the corporation, an assertion the judge declared had no basis in fact under the express terms of the amended limited partnership agreement.

▪ In addition, the jury foreman stated in an affidavit that the trial judge favored the defendants by giving their counsel leeway to ask the questions they desired and refusing the same leeway to plaintiff's counsel. While the jury foreman's overall perception of the trial judge's bias certainly gives us pause, the affidavit does not identify specific instances that support this view. Hoggett refers to isolated instances where the judge made an objection for defense counsel or sustained defense counsel's objection before it was finished. However, these instances, when viewed in context, reflect the trial judge's impatience with the pace of the trial, not bias to the plaintiffs' case. Likewise, the trial judge's disparaging comment to other lawyers about a plaintiffs' expert, while inappropriate, does not alone establish that his rulings were biased. The same is true when the trial judge stated prior to the punitive damage phase that he thought the $2 million awarded by the jury in the first part of the trial included punitive damages. The judge still tried the issue of punitive damages.

▪ Finally, there is a juror's written statement describing how the judge asked her questions about the case before excusing her from the jury. According to the statement, the juror had explained to the attorneys and the judge, apparently during jury selection, that she had made arrangements for a trip overseas. The judge told her the trial would "probably" be completed before her trip and refused to excuse her. When the time for her trip approached, the judge called her into his chambers during the jury's lunch break and told her the trial was lasting much longer than anticipated. The judge then asked her questions about the case, including what damages should be awarded, whether Carlin and Brown had planned to

get rid of Hoggett "from the start," and whether Brown was "illegally represented as a board director." Following the discussion, the juror was excused to go on her trip.

This conduct does not evidence bias toward the plaintiffs. To the contrary, the tenor of the questions favored the plaintiffs. Furthermore, the juror's statement does not divulge her answers to these questions. Hoggett suggests the trial judge refused most of their requested issues because of this interview. However, Hoggett's claim is not supported by any citation to the record and our review of the record reveals nothing that would support a connection between this interview and the trial court's refusal to submit plaintiffs' claims.[19] Accordingly, based on our review of the record, we are unable to conclude the denial of Hoggett's motion to recuse was an abuse of discretion. *See* Tex.R. Civ. P. 18a(f); *See also Gulf Maritime*, 858 S.W.2d at 558. Points of error sixteen and seventeen are overruled.

## IX. PROMISSORY NOTES

In points of error eighteen through twenty, Hoggett complains about the recovery on certain promissory notes. As we described, Hoggett and Investa loaned money to the limited partnership and Telescan in late 1985. The loans are evidenced by three promissory notes in the form of letter agreements, two signed by Hoggett and Carlin on behalf of the limited partnership, and one signed by Hoggett on behalf of Telescan. The trial court's final judgment awarded Investa recovery on these notes for $ 15,000, $20,000, and $5,000, respectively. Adding interest as stipulated by the parties, the court awarded Investa a total of $85,450.

Hoggett first contends the trial court should have awarded him, and not Investa, recovery on the $5000 note because it is a loan from him, individually. Appellees' do not contest Hoggett's right to recover on the $5,000 note individually, but simply point out it should not be held liable for the cost of appeal for the court's error. *See* Tex.R.App. P. 89. We agree. Prior to closing argu-

ment, the parties stipulated to interest on "the notes of $40,000 to Investa and/or Derek Hoggett." Although this stipulation does not specifically identify each note, the terms of each note are established by the pleadings and evidence. Thus, the court should have ordered the $5000 note paid to Hoggett, individually, instead of to Investa. Point of error eighteen is sustained. However, we need not reverse the judgment below. Instead, we modify the judgment to award $10,650 ($5,000 in principal plus $5,650 in interest) to Hoggett, individually, and reduce the award to Investa accordingly.

▪ ■ Hoggett also contends he and Investa are entitled to attorney's fees, court costs, and post-judgment interest as a matter of law for recovery on these promissory notes. Hoggett's contention is waived because it is not supported by any argument or authority. Tex.R.App. P. 74(f); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 934 (Tex.1983). Points of error nineteen and twenty are overruled.

Accordingly, the trial court's judgment is modified to allow Hoggett instead of Investa, recovery on the $5000 note according to the terms set in the judgment. The remainder of the trial court's judgment is affirmed.

---

**19.** Hoggett also claims the judge, in a pre-trial ruling, allowed appellees to present evidence relating to their counterclaims, even though those claims were found adversely to them in the first trial and were never appealed. This claim is also not supported by citation to the record.