**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00340-CV**
_____

**CLOTILDE EAKER, Appellant**

**V.**

**JOHN E. MANGIAMELI, JOSEPH L. MANGIAMELI, AND THE JOLE P. EAKER IRREVOCABLE TRUST, Appellees**

_____

**On Appeal from the County Court at Law No. 2**
**Montgomery County, Texas**
**Trial Cause No. 17-30341**
_____

**MEMORANDUM OPINION**

Clotilde Eaker (Eaker or Plaintiff) sued John E. Mangiameli, Joseph L. Mangiameli, James H. Stilwell, Martin, Earl and Stilwell, LLP, and the Jole P. Eaker Irrevocable Trust relating to a mediated settlement agreement that was executed between the parties. Eaker appeals the trial court's final judgment rendered on October 2, 2019, which incorporated by reference several summary judgment rulings rendered by the trial court and otherwise rendered a final judgment in favor of John

1

E. Mangiameli (John), Joseph L. Mangiameli (Joseph), and the Jole P. Eaker Irrevocable Trust (the Trust) (collectively Defendants or Appellees), and it awarded attorney's fees to the Defendants.[1] For reasons explained herein, we affirm.

Background

The Plaintiff's mother was Jole P. Eaker, and Jole died in 2015. Before her death, Jole executed a Last Will and Testament (dated May 7, 2014) (the Will), and in 2001 Jole established the Jole P. Eaker Irrevocable Trust (the Trust).[2] According to Plaintiff's Petition (the Petition),[3] Joseph is a Co-Trustee of the Trust, and he was named as Executor in the Last Will and Testament of Jole Piccoli Eaker which he filed for Probate on February 2, 2015. In this case, Plaintiff alleged in her Petition that Joseph filed an "Application for Probate of Copy of the Will as Muniment of Title" in Cause No. 15-32277-P, *In the Estate of Jole Piccoli Eaker, Deceased*, in the County Court at Law No. 2 of Montgomery County, Texas. Plaintiff further alleged that on February 26, 2015, Maria Eaker Moreland (Jole's other daughter)

---

[1] The Final Judgment in this case also incorporated by reference the trial court's order of December 18, 2017, dismissing Eaker's claims against James H. Stilwell and Martin, Earl & Stilwell, LLP, and awarding $2,700.00 in attorneys' fees against Eaker. Eaker did not complain on appeal about that part of the judgment, and therefore we will only discuss the claims against Stilwell and Martin, Earl & Stilwell, LLP as necessary.

[2] The Trust was established by a written Trust Agreement, and it was last amended by a written amendment dated May 29, 2014.

[3] Plaintiff's Fifth Amended Petition For Declaratory Judgment was the live petition before the trial court at the time the trial court granted the final judgment.

2

filed an "Objection to Application for Probate of Will As Muniment of Title[.]" On August 11, 2015, Eaker filed an "Objection to Application for Probate of Will as Muniment of Title." In their Objections to the Application for Probate of the Will, Eaker and her sister, Maria, alleged that their Mother lacked testamentary capacity at the time she executed the Will, and according to her summary judgment filings, Eaker claimed her Mother lacked testamentary capacity at the time she executed the "Amendment to The Jole P. Eaker Irrevocable Trust" that was amended by Jole in May of 2014. Neither Maria nor Eaker were named as beneficiaries under the Amendment to the Trust. On July 29, 2016, Joseph, John (Joseph's brother and Co-Trustee of the Trust), Eaker, and Maria attended a mediation. The claims were settled during the mediation, and the parties executed a written mediated "Settlement Agreement and Release" (MSA) that outlined the terms of the settlement.[4]

The MSA expressly stated that the parties agreed that Eaker would receive the house located at 7082 Sandy Cove Lane, Willis, Texas 77318; Eaker and Maria would receive the locked box currently held by John and all jewelry owned by Jole at her death; the locked box would be delivered to the office of James Stilwell on or before August 5, 2016; the Co-Trustees agreed to assign to Eaker a note owned by

---

[4] According to the appellate record, Joseph and John were Jole's grandchildren and are Maria's sons. According to Joseph's deposition that was filed in the record, the Trust was originally created by Jole in 2001 for Jole's care, and when she passed away in 2015, the Trust continued for the purpose of managing Jole's assets that were part of the Trust.

the Trust, which contains a promise by Maria and her husband to repay the Jole Trust,[5] and they were to deliver the note to James Stilwell on or before August 5, 2016; the Co-Trustees were to use $200,000 to purchase an Annuity to be owned by the Trust and Eaker would be the beneficiary under the annuity and Eaker was supposed to pick the annuity company and the Co-Trustee will name Eaker's grandchildren as death recipients; Joseph shall probate the 2014 Will of Jole Piccoli Eaker as muniment as soon as the Court can schedule it, and Maria agrees not to file any claims against the Trust or estate; the Parties will dismiss their lawsuits against each other with Prejudice and all fees will be borne by the party incurring the same; and Jole's Trust shall be continued for the sole purpose of holding the annuity through Eaker's death. The Co-Trustees also agreed in the MSA that they will not sell or assign the annuity or change the death beneficiaries. The MSA further stated that it would "supersede[] any trust language to the contrary." And the MSA stated the parties agreed to execute all documents "necessary to effectuate this agreement and to cooperate in the exchange of any information required for the transfer of any assets."

According to the MSA, John and Joseph also agreed to release Eaker and Maria of any current or future claims relating to the estate or trust(s) set up by Jole

---

[5] According to the testimony of Defendants' counsel, the note the Trust held was a $500,000 note that Maria and her husband were repaying. The MSA assigned the note to Eaker to provide her a continuous income stream.

4

except for the provisions in the MSA, and Eaker and Maria agreed to release John and Joseph of any current or future claims relating to the estate or trust(s) set up by Jole except for the provisions in the MSA. The parties further agreed that the MSA is "final and binding on all parties and is not subject to revocation."

On August 10, 2016, the trial court signed an order granting the Joint Motion to Dismiss the Will and Trust Contest with Prejudice except for Joseph and John Mangiameli's Application to Probate Decedent's May 2014 Will as a Muniment of Title. The trial court also ordered that all costs, expenses, fees, including attorney's fees, for the Will and Trust Contest and Counterclaim be borne by the party incurring the same. On September 30, 2016, Eaker's counsel gave notice to defense counsel, Stilwell, that Eaker had chosen an annuity.

According to Eaker, on May 14, 2017, she filed a motion for enforcement and clarification of the MSA after she was "[u]nable to obtain any meaningful response from the Mangiamelis regarding the purchase of an annuity[.]" Eaker alleged that she did not receive information that the annuity had actually been purchased until July 5, 2017, when Stilwell informed Eaker that the annuity had been purchased and sent her a copy of the annuity contract that was dated February 8, 2017. According to Eaker, on September 11, 2017, she received notification from a representative of the annuity company that on February 6, 2017, the Mangiamelis and the Trust had purchased the annuity (that Eaker had chosen) and that they purchased it "with the

5

intent of letting the funds grow for three years before taking any distributions[]" on the advice of a representative of Principal Financial.

Eaker then filed a Petition against the Mangiamelis and the Trust for breach of contract, breach of fiduciary duty, gross negligence, and for a declaratory judgment. Eaker alleged that the Mangiamelis breached the MSA by delaying the purchase of the annuity and failing to establish regular monthly annuity benefit payments (or distributions) to Eaker.[6] Eaker alleged that the express terms of the MSA are ambiguous as to whether she is to receive a benefit from the annuity, but the intent of the parties going into that contract was that Eaker was to receive a benefit of regular payments under the annuity. Eaker additionally and alternatively sought specific performance requiring the Mangiamelis to instruct the annuity group to pay her a monthly benefit payment under a five-year income and that she should be reimbursed at least $1,200 each month from October 2016 to the date of the final trial of the matter.

As to Eaker's claims for breach of fiduciary duty and gross negligence, she alleged that despite the Mangiamelis' representations to her attorney through March 2017 that an annuity had not been purchased, she was not notified until July 5, 2017, that the annuity had been purchased on February 6, 2017. Eaker further alleged that

---

[6] Eaker's claim for breach of the MSA is only as to the terms regarding the annuity.

the Mangiamelis breached their fiduciary duty as trustees and acted with gross negligence in the following ways:

> they violated the duty of disclosure by failing to disclose the purchase of the annuity to [Eaker] until several months after its purchase; they violated the duty of candor by misrepresenting that they had not purchased the annuity when in fact they had; they violated the duty to refrain from self-dealing by failing to assign annuity payments to a beneficiary other than themselves; and they violated their duty of loyalty by depriving [Eaker] of any benefit from the annuity, needlessly extending the administration of the trust, and using their power as trustees to achieve their personal ends. These breaches of fiduciary duty also constitute a breach of trust.

Eaker requested a clarification under the Uniform Declaratory Judgments Act (UDJA) to the extent the MSA is ambiguous with respect to the Mangiamelis' duties in purchasing an annuity, which she alleged provides for a monthly benefit. Eaker also sought attorney's fees.

The Defendants filed a series of motions for partial summary judgment on each of the claims. On January 14, 2019, the trial court granted the Defendants' motion for partial summary judgment on Eaker's claim for breach of the MSA.[7] On February 1, 2019, the trial court granted the Mangiamelis' and the Trust's partial

---

[7] On March 5, 2018, the trial court partially granted Eaker's motion for summary judgment to the extent that it found that the MSA was ambiguous because it did not state the name of the annuitant or who would choose the annuity. The trial court, however, granted partial summary judgment for Defendants on Plaintiff's breach of settlement agreement claim on March 15, 2018, but then on August 15, 2018, the trial court reversed and denied partial summary for Defendants on the breach of settlement claim. After reconsideration, the trial court withdrew the August 15, 2018 order with the January 14, 2019 order.

motion for summary judgment on Eaker's claim for breach of fiduciary duty and gross negligence. On the same date, the trial court also granted the Mangiamelis' and the Trust's partial motion for summary judgment on Eaker's claim for declaratory judgment and also denied Eaker's cross-motion for summary judgment on her claims for declaratory judgment. Eaker appealed all of these orders to this Court, and this Court dismissed her appeal for lack of jurisdiction because the orders were interlocutory and not yet final appealable orders.[8]

The trial court held a trial on the only remaining matter, attorney's fees. On October 2, 2019, the trial court signed a Final Judgment granting summary judgment in favor of the Mangiamelis and the Trust on all of Eaker's claims against them (and incorporating the trial court's orders granting partial motions for summary judgment dated February 1, 2019, that entered take-nothing judgments against Eaker), and ordering Eaker to pay the Mangiamelis and the Trust $84,250.60 in attorney's fees and $1,375.29 for the past completed appeal. Eaker appealed. On October 30, 2019, the trial court signed findings of fact and conclusions of law regarding the attorney's fees, and the trial court noted that no findings and conclusions on the summary judgment rulings were included because "[f]indings and [c]onclusions are not appropriate for summary judgment rulings[.]"

---

[8] *See Eaker v. Mangiameli*, No. 09-19-00036-CV, 2019 Tex. App. LEXIS 2464 (Tex. App.—Beaumont Mar. 28, 2019, no pet.) (mem. op.).

## Appellate Issues

In her first three issues, Eaker argues that the trial court erred in granting summary judgment in favor of Appellees on Eaker's claims for breach of the MSA, breach of fiduciary duty, gross negligence, and declaratory judgment. In her fourth and fifth issues, Eaker argues the trial court erred in awarding Appellees attorney's fees under the UDJA and the Texas Trust Act and she argues that the Appellees failed to segregate the attorney's fees between "discrete legal work that is not recoverable."

## Standard of Review and Applicable Law

We review grants of summary judgment de novo. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). The movant for a traditional motion for summary judgment has the burden to establish that no genuine issues of material fact exist and that movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). If the moving party produces evidence entitling it to summary judgment, the burden shifts to the nonmovant to present evidence that raises a material fact issue. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). The trial court may consider all competent evidence on file at the time of the summary judgment hearing. *See* Tex. R. Civ. P. 166a; *Lance v. Robinson*, 543 S.W.3d 723, 732 (Tex. 2018).

In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon*, 690 S.W.2d at 548-49. Every reasonable inference must be indulged in favor of the nonmovant, and any doubts must be resolved in the nonmovant's favor. *Id.* at 549. Because the trial court's orders in this case granting the partial summary judgments do not specify the grounds for its summary judgments, we must affirm the summary judgments if any of the theories presented to the trial court and preserved for appellate review are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003) (citing *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)).

Summary Judgment on Breach of Contract Claim

In her first issue, Eaker argues that the trial court erred in granting summary judgment in favor of Appellees on Eaker's claims for breach of the mediated settlement agreement. Mediated settlement agreements are enforceable as contracts. Tex. Civ. Prac. & Rem. Code Ann. § 154.071(a). We interpret settlement agreements under ordinary contract interpretation principles. *Sandt v. Energy Maint. Servs. Grp. I, LLC*, 534 S.W.3d 626, 642 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). The essential elements of a breach of contract cause of action are: "(1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or

10

tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

In Eaker's Motion for Summary Judgment, she argued, among other things, that the trial court should grant summary judgment declaring that the MSA is unambiguous and that it provided that once the annuity was purchased, the annuity will provide periodic payments to Eaker and within a reasonable time of the execution of the MSA. But Eaker also argued in the alternative that the trial court should grant summary judgment declaring that the MSA is ambiguous only as to whether the annuity will provide periodic payments to Eaker, as to when the annuity will provide periodic payments to Eaker, and how the annuity should be structured to provide periodic payments to Eaker.

In their Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment, Defendants argued that they were entitled to a partial summary judgment on Eaker's claim for breach of the MSA because they complied with the terms of the MSA and the MSA is unambiguous. Appellees attached evidence to their response and cross-motion, which included a copy of the MSA and an Acknowledgement of Delivery from Principal Financial Group dated February 8, 2017, evidencing the Trust had purchased an annuity and that the Trust was the owner of the fixed deferred annuity contract that was issued by Principal

11

Life Insurance Company in the amount of $200,000, it was for the benefit of the annuitant Clotilde Eaker, and it was issued on February 6, 2017, with the primary beneficiary designation noted as "Madison McKelvy[,] Great-grandchildren[.]" The evidence further established that it was the annuity Eaker had chosen, and that it had a three-year deferral period that ended February 5, 2020, with an initial guaranteed interest rate of 1.60. Also attached to the response and cross-motion for partial summary judgment was an Affidavit of John Mangiameli where he averred in relevant part that he is Co-Trustee of the Trust and:

> [t]he July 29, 2016 settlement agreement provided that in addition to certain specific assets to be received by my Aunt, that she would select an annuity for the [Trust] to purchase for $200,000; that my brother and I as Co-Trustees would purchase the annuity; that the Trust would own and hold the annuity; and that the annuity would name Aunt [Eaker]'s grandchildren as death beneficiaries. Once [Eaker] selected the annuity she desired and provided the necessary information identifying it, that my brother and I as Co-Trustees purchased the exact annuity she picked out.
>
> . . . .
>
> [] Taken term-by-term, each term of the agreement was performed:
>     A. As Co-Trustees, Joseph and I used $200,000 to purchase an Annuity.
>     B. The Annuity is owned by the Trust.
>     C. [Eaker] picked the annuity company (and Joseph and I even let [Eaker] pick the exact annuity she wanted).
>     D. Joseph and I, as Co-Trustees of my grandmother's trust, named [Eaker]'s grandchildren as death recipients.
>
> [] Further, if you look at the settlement terms in paragraph G, those terms have also been fully complied with. Specifically,

12

A. Jole's Trust has been continued for the purpose of holding the annuity through [Eaker]'s death.
B. Joseph and I as Co-Trustees have not sold or assigned the annuity.
C. Joseph and I as Co-Trustees have not changed the death beneficiaries.

[] There has been no breach of the settlement agreement.

[] The settlement agreement is unambiguous about what it says.

It specifies the WHO (who would buy the annuity, who would own the annuity, who would be death beneficiaries).
It specifies the WHAT (an annuity picked out by Plaintiff from the myriads of annuity products available on the market).
It specifies WHERE (it would be held by the Trust, for Plaintiff's life).
It specifies WHY (in settlement and resolution of the parties' disputes).
It specifies HOW MUCH ($200,000).
It specifies WHICH ONE (the annuity company selected by Plaintiff).
It specifies WHAT KIND (an annuity, selected by Plaintiff).
It specifies HOW MANY (one annuity).

[] It is unambiguous that the settlement agreement required my brother Joseph and me as Co-Trustees to buy an annuity. It is also unambiguous that the settlement agreement specified that additional documents would need to be executed—like the contract for the annuity. The settlement agreement does not say when [Eaker] would make her selection—and knowing that she was selecting the annuity of her choosing from the entire universe of the wide variety of different annuities available in the marketplace, there was not a need for a deadline. The settlement agreement also did not say what the timing and payout of the annuity would look like, because there was no way to know that until [Eaker] selected the annuity she wanted, and that annuity's terms would govern the timing and amount of any annuity payouts. The settlement agreement did not specify how the annuity should be structured—but that does not make it ambiguous! Because [Eaker] was picking the annuity she wanted, there was not a need for the settlement agreement to specify that. The fact that the settlement agreement is silent about how the annuity would work is intentional and

13

it was written that way because [Eaker] was getting to choose an annuity with a structure she liked.

[] In fact, [Eaker] picked the annuity, my brother and I as Co-Trustees bought it, and the contract for the annuity [Eaker] picked contains the terms and conditions and timing for payouts from the annuity.

Another exhibit to Defendant's Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment included an email from Patrick Rogan with Capital One (Plaintiff's broker) wherein Rogan advised the parties that the annuity selected by Plaintiff has a three-year period where there are penalties if payments are received during that time.

In Eaker's Response in Opposition to Defendants' Motion for Summary Judgment, she incorporated her arguments from her Motion for Summary Judgment and argued that Defendants breached the MSA because under the plain language of the MSA, Defendants were to purchase an annuity that provided monthly payments to Eaker, and they purchased an annuity that allowed for no annuity distributions for the three-year penalty period provided for in the annuity contract. Eaker cited to Black's Law Dictionary and caselaw in support of her contention that the plain meaning of "annuity" is "periodic payments[.]" She also argued that the Defendants also failed to perform under the MSA because although Defendants purchased an annuity that designates Eaker as the annuitant, the annuity contract provides payments to the owner of the annuity contract (here, the Defendants), not the

14

annuitant. Eaker also stated in her response that under the terms of the MSA she was to pick the annuity company, not the exact annuity for the Trust to purchase.

Defendants filed a Reply in Support of Defendants' Cross-Motion for Partial Summary Judgment wherein they argue that every element of the MSA has been complied with, Eaker has failed to prove any breach as a matter of law and did not raise a genuine issue of material fact as to breach, that no part of the MSA requires Defendants to pay Eaker "monthly periodic payments[,]" that the annuity contract Eaker chose allows for periodic payments to Eaker after a three-year penalty period, which was advised by "Plaintiff's broker with Capital One." In support of these arguments, Defendants referred to the exhibits attached to their cross-motion for partial summary judgment.

## Was the MSA Ambiguous?

Whether a contract is ambiguous is a question of law for the court to decide and is subject to de novo review. *See Progressive Cty. Mut. Ins. Co. v. Kelley*, 284 S.W.3d 805, 808 (Tex. 2009); *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008). To determine whether a contract is ambiguous, a court looks at the contract as a whole and considers the circumstances at the time of agreement. *See Sadler Clinic Ass'n, P.A. v. Hart*, 403 S.W.3d 891, 895 (Tex. App.—Beaumont 2013, pet. denied) (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)); *see also Med. Towers, Ltd. v. St. Luke's*

*Episcopal Hosp.*, 750 S.W.2d 820, 823 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (Evidence of circumstances surrounding the execution of an unambiguous contract may be considered to help the court evaluate the parties' intent). "A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). Generally, when a contract is ambiguous, a grant of summary judgment is improper because interpretation of the contract will be a fact issue. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). That said, simply because a contract may be silent on some aspect of performance does not necessarily mean the contract is ambiguous. *See Sifuentes v. Carrillo*, 982 S.W.2d 500, 504 (Tex. App.—San Antonio 1998, pet. denied). If a contract is silent then "the question is not one of interpreting the language but rather one of determining its effect." *Id.*; *Med. Towers, Ltd.*, 750 S.W.2d at 822. Similarly, a mere lack of clarity does not create an ambiguity; nor does an ambiguity arise merely because the parties to the agreement offer different interpretations of the agreement. *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). "[A]n ambiguity does not exist simply because the parties interpret a [contract] differently." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010) (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)). If a contract as written can be given a clear and definite legal meaning, then it is not ambiguous as a matter

16

of law. *Id.* (citing *Progressive Cty. Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003); *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997)).

To the extent Eaker argues on appeal that the section of the MSA regarding the purchase of the annuity is ambiguous, we disagree. We find that the MSA was unambiguous as it expressly provided that the Co-Trustees will use $200,000 to purchase an Annuity that shall be owned by the Trust, Eaker will pick the annuity company, and the Co-Trustee will name Eaker's grandchildren as death recipients. Defendants attached uncontroverted evidence to their summary judgment motion showing that the Trust purchased a $200,000 annuity from the company chosen by Eaker and further that the actual annuity was chosen by Eaker, that it was owned by the Trust and that it named Eaker as the annuitant and Eaker's only grandchild as the death beneficiary. Although the MSA is silent as to how and when the annuity payments to the annuitant would begin under the annuity, the parties agreed that Eaker would choose the annuity contract for the Trust to purchase and that the Trust would own the annuity. The specific terms and conditions of the annuity are in the annuity contract selected by Eaker.

Eaker bore the burden to establish a genuine issue of material fact regarding whether Appellees performed under the MSA. Eaker does not allege there is a breach of the annuity contract, she only alleges that Defendants breached the MSA. In her response to Appellees' motion for summary judgment on Eaker's claim for breach

17

of the MSA and on appeal, Eaker alleges that Appellees breached the MSA by purchasing an annuity that did not allow for monthly annuity distributions to Eaker for the first three years. The MSA required the Trust to purchase a $200,000 annuity, with the annuity company picked by Eaker, the Trust would own the annuity, and that the death beneficiaries would be Eaker's grandchildren. The MSA did not specify when any specific periodic payments would begin but instead stated that "[t]he parties agree to execute all documents necessary to effectuate this agreement[,]" which would allow for the terms of the annuity contract to provide the details of the annuity terms. The Defendants presented evidence that the annuity the Trust purchased was the actual annuity chosen by Eaker. Eaker has failed to create a genuine issue of a material fact that Appellees failed to comply with the terms of the MSA as to the annuity. We overrule issue one.

Summary Judgment on Breach of Fiduciary Duty and Gross Negligence Claims

In issue two, Eaker argues that the trial court erred in granting summary judgment in favor of Appellees on Eaker's claims for breach of fiduciary duty and gross negligence. Specifically, Eaker bases both claims on Joseph Mangiameli's testimony that Eaker argues is an "outright admission[]" of the existence of a fiduciary duty, and she asserts that the Mangiamelis' asserted in their Answer a request for a limitation of liability as Trustees and that such "estop[]s the Defendants to deny the existence of the trust as creating [a] fiduciary relationship between the

18

parties." According to Eaker, the Mangiamelis' position as Trustees at the very least creates an informal fiduciary relationship.

To prevail on a claim for breach of fiduciary duty, a plaintiff must prove the existence of the fiduciary relationship and a breach of that duty by the defendant, which caused damages to the plaintiff or benefit to the defendant. *Jordan v. Lyles*, 455 S.W.3d 785, 792 (Tex. App.—Tyler 2015, no pet.) (op. on reh'g). A fiduciary relationship exists between a trustee and the trust beneficiary, and the trustee must not breach or violate this relationship. *Herschbach v. City of Corpus Christi*, 883 S.W.2d 720, 735 (Tex. App.—Corpus Christi 1994, writ denied). A fiduciary owes his principal a high duty of good faith, fair dealing, honest performance, and strict accountability. *In re Estate of Miller*, 446 S.W.3d 445, 455 (Tex. App.—Tyler 2014, no pet.).

To establish a fiduciary relationship, Eaker must prove a relationship between the parties involving "a high degree of trust and confidence . . . prior to, and apart from[]" the MSA. *See Schlumberer Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176-77 (Tex. 1997). A fiduciary duty generally "arises from the relationship of the parties and not from the contract." *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex. 1984).

Defendants' motion for partial summary judgment alleged that there is only a contractual relationship between the Defendants and Eaker, Eaker was not and is not a beneficiary of the Trust, and therefore, they owed no fiduciary duty to Eaker.

19

Defendants also argued they were entitled to summary judgment on Eaker's claim

for gross negligence:

> [The MSA] only established a contractual relationship between [Eaker]
> and Defendants and not a fiduciary relationship or legal duty between
> them and the Annuity Contract did not establish a contractual
> relationship, fiduciary relationship, or legal duty between them.

Eaker argued in her response to the motion for partial summary judgment that

Joseph Mangiameli "testified that he acted throughout in his capacity as a Trustee,

and that the annuity purchased was, in his view and contemporaneous understanding,

to benefit Plaintiff, with her grandchildren as her death beneficiaries." Eaker

attached to her response an excerpt of Joseph's deposition testimony wherein he

testified as follows:

> Q. (By [Plaintiff's Counsel]) Does that -- to do what's right to the trust,
> does that also include [Eaker]?
> A. The trust is set up for [Eaker]'s long term benefit.
> Q. Okay. Does that fiduciary duty, does that go to [Eaker]?
> A. It goes to what's in the best interest of the trust and what's in the
> best interest for the long-term benefit.
> Q. And does that benefit also include [Eaker]?
> A. It is set up for the benefit of -- as I understand it, it is set up as a --
> as how it stands now, it's now the benefit for her long-term -- it's a
> long-term benefit for her.
> Q. Okay. So, that does include [Eaker]?
> A. Long-term, yes.

Eaker argued that this testimony constitutes an "outright admission[] of the existence

of a fiduciary duty" owed to Eaker by a person acting as a Trustee and that the

20

testimony creates a fact issue fatal to Defendants' motion for summary judgment on Eaker's claims for breach of fiduciary duty and gross negligence.

According to the record, section 2.05 of the Trust provides that the beneficiaries of the Trust are John and Joseph Mangiameli, their wives, and their descendants, but it expressly states the beneficiaries "shall not include my daughter, Maria [] or my daughter Clotilde Eaker or her descendants." The fact that the Defendants were trustees under the Trust agreement does not create a fiduciary duty to Eaker under the MSA agreement. According to the record, the Trust continues to exist as the owner of the annuity. The mediated settlement agreement was just that, a mediated settlement agreement between parties who held adverse interests in certain underlying claims that were resolved by virtue of the settlement agreement. The MSA is a contract between the Mangiamelis (who were Co-Trustees of the Trust), the Trust, and Eaker. It did not alter the terms of the Trust agreement or create any additional fiduciary responsibilities of the Trustees under the Trust agreement. Rather, the MSA was a binding settlement agreement between the parties thereto and it provided that the Trust would purchase an annuity to be chosen by Eaker, and that the Trust would own the annuity. We conclude that the Trust's purchase of the annuity for Eaker does not make Eaker a beneficiary of the Trust. We note that Eaker has not challenged the terms of the annuity, and she has not attempted to set aside the settlement agreement in its entirety. Rather, she seeks to enforce the agreement,

21

but contends the Defendants breached the agreement in failing to purchase an annuity that provided immediate payments to her.

Based on our review of the entire excerpt of Joseph's deposition attached to Eaker's response to Defendants' motion for summary judgment, we do not agree with Eaker that the excerpt shows an "outright admission[]," nor does it create a fact issue that the Mangiamelis as Trustees owed Eaker a fiduciary duty. In fact, Joseph testified as to the relationship as follows:

> Q. (By Plaintiff's Counsel) And so, the annuity is -- you consider the annuity then to be an investment for the trust assets; is that right?
> A. It -- it is an investment.
> Q. And that would be for the benefit of the trust; is that correct?
> A. . . . [I]t is set up to be a long-term benefit.
> Q. But I know you've testified to that previously.
> A. For [Eaker]. So, it is an investment of the trust. And as co-trustee of the trust, we have a fiduciary responsibility to ensure that we are fiscally responsible.
> Q. Okay. To [Eaker]?
> A. To the trust.
> Q. But not to [Eaker]?
> A. To the trust.

Joseph further testified that Eaker had not received benefits from the annuity because a financial advisor advised that under the annuity contract "there's a period of time that it -- you get a maximum interest rate during the holding period and if you touch money during that holding period [it] is unwise because there's less money there to grow."

We also disagree with Eaker's argument that the settlement agreement created an informal fiduciary relationship between the Defendants and Eaker. A fiduciary relationship is an extraordinary one and will not be lightly created. *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). "It is well settled that 'not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.'" *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (quoting *Schlumberger Tech. Corp.*, 959 S.W.2d at 176-77). "A person is justified in placing confidence in the belief that another party will act in his or her best interest only where he or she is accustomed to being guided by the judgment or advice of the other party, and there exists a long association in a business relationship, as well as personal friendship." *Hoggett*, 971 S.W.2d at 488. As to business transactions, courts are hesitant to create informal fiduciary relationships. *Gregan v. Kelly*, 355 S.W.3d 223, 228 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "Courts review a variety of facts for determining whether an informal fiduciary relationship exists." *Id.* "The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). In reviewing the relationship between the parties, one factor we consider is whether the party claiming to be owed a fiduciary relationship justifiably placed special confidence in the other party to act in his best interest. *See Trostle v. Trostle*, 77 S.W.3d 908, 914-

23

15 (Tex. App.—Amarillo 2002, no pet.) (To establish a fiduciary relationship, evidence must demonstrate the plaintiff actually relied on the purported fiduciary "for moral, financial, or personal support or guidance."); *see also Lee v. Hasson*, 286 S.W.3d 1, 14-15 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (same). An informal fiduciary relationship requires proof that, because of a close or special relationship, the plaintiff "is in fact accustomed to be guided by the judgment or advice" of the other. *Thigpen*, 363 S.W.2d at 253.

Eaker has not shown that she relied upon or was accustomed to being guided by the judgment or advice of the Mangiamelis in either the selection of the annuity or the annuity company, and the fact that Eaker and the Mangiamelis were parties to the MSA that provided that the Mangiamelis purchase an annuity does not in and of itself create an informal fiduciary relationship. Eaker was represented by her own attorney in the negotiation of the settlement agreement, and she has failed to raise a fact issue on the existence of a fiduciary relationship or an informal fiduciary relationship with respect to the MSA.

Eaker's gross negligence claim appears to be dependent upon her allegation that a fiduciary duty exists. As we have already explained, the MSA did not create a fiduciary relationship between the parties to the MSA and the Defendants did not owe a fiduciary duty to Eaker under the MSA. We reject Eaker's argument that there was an "informal fiduciary relationship" under the MSA. We conclude that the trial

24

court did not err in granting Appellees' motion for partial summary judgment on Eaker's tort claims for breach of fiduciary duty and gross negligence. We overrule issue two.

Summary Judgment as to Declaratory Judgment Claims

In issue three, Eaker argues that the trial court erred in granting summary judgment in favor of Appellees on Eaker's claims for declaratory judgment. On appeal, Eaker argues that her "requests for declaratory relief involve aspects of this justiciable controversy that can be resolved by a declaration[]" and that the trial court should have declared the amount of the annuity benefits, the time for performance (the time the Mangiamelis were to purchase the annuity and the time that the monthly payments are scheduled to begin), and that the MSA is a modification/extension of the Trust because "the Mangiamelis believed that the Trust was continued for [Eaker]'s benefit."

We first address Eaker's argument that the trial court erred in dismissing her declaratory action requesting a declaration as to the amount of annuity benefits and time of performance. In construing a contract, courts may not rewrite the agreement or add to its language. *Garza v. Villarreal*, 345 S.W.3d 473, 480 (Tex. App.—San Antonio 2011, pet. denied) (citing *Schaefer*, 124 S.W.3d at 162). Accordingly, the trial court did not err in granting Appellees' partial motion for summary judgment on Eaker's claims for declaratory judgment on those grounds. As for Eaker's

argument that the trial court erred in dismissing her declaratory judgment requesting a declaration that the MSA is a modification/extension of the Trust, we disagree. A declaration that the settlement agreement modified and extended the Trust was not supported by the facts or law. We overrule issue three.

Attorney's Fees

In issue four, Eaker argues the trial court erred in awarding attorney's fees under section 37.009 of the Uniform Declaratory Judgments Act and section 114.064 of the Texas Trust Act. According to Eaker, the attorney's fees awarded under section 37.009 of the UDJA "were not equitable and just, due to the Mangiamielis' and Stilwell's misrepresentations [to] the Court regarding the purchase of the annuity, and, otherwise, continual delay and obfuscation tactics[,]" and that if this Court overturns the summary judgment on her declaratory judgment claim this Court must also overturn the attorney's fees awarded. She also asserted at trial and on appeal that the Mangiamelis are not entitled to attorney's fees under the Texas Trust Act because she did not bring a claim under the trust provisions of the Texas Property Code. In issue five, Eaker argues the trial court erred in awarding attorney's fees because the Mangiamelis and the Trust "fail[ed] to segregate between discre[]te legal work that is not recoverable[.]" Eaker specifically argues that despite the trial court's finding otherwise, the Defendants did not properly segregate fees and that the Mangiamelis cannot recover for work related to any cause of action that is not

26

recoverable and for the discrete legal work that related to claims that are not recoverable. According to Eaker, under Chapter 38 a successful defendant cannot recover attorney's fees on a motion for summary judgment on a breach of contract claim, and attorney's fees are not recoverable for time spent on the motion for summary judgment relating to breach of fiduciary duty and gross negligence because those are common law torts.

Generally, in Texas, each party must pay its own attorney's fees. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 483 (Tex. 2019). There are certain circumstances, however, in which the prevailing party can recover fees from the opposing party. *Id.* at 484; *In re Nat'l Lloyds, Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding) ("Texas follows the American rule on attorney's fees, which provides that, generally, 'a party may not recover attorney's fees unless authorized by statute or contract.'") (quoting *Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 453 n.4 (Tex. 2016)). When shifting of attorney's fees is authorized whether by statute or contract, the party seeking the fee award must prove that the requested attorney's fees are reasonable and necessary. *Rohrmoos Venture*, 578 S.W.3d at 484.

In reviewing the sufficiency of the attorney-fee evidence in this case, the lodestar analysis applies, as it does in "any situation in which an objective calculation of reasonable hours worked times a reasonable rate can be employed" to

determine the amount of attorney's fees to be awarded in a fee-shifting scenario. *Id.* at 497-98. The factfinder's "starting point" for calculating an award of attorney's fees is "determining the reasonable hours worked multiplied by a reasonable hourly rate," and the party seeking recovery of attorney's fees bears the burden of providing sufficient evidence on both counts. *Id.* at 498; *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012) (stating that first step of lodestar analysis involves determining reasonable hours spent by counsel and reasonable hourly rate, then multiplying number of hours by rate to get base lodestar and that second step of analysis involves adjusting base amount up or down "if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case[]"). "This base lodestar figure should approximate the reasonable value of legal services provided in prosecuting or defending the prevailing party's claim through the litigation process." *Rohrmoos Venture*, 578 S.W.3d at 498. "[T]here is a presumption that the base lodestar calculation, when supported by sufficient evidence, reflects the reasonable and necessary attorney's fees that can be shifted to the non-prevailing party." *Id.* at 499.

"Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* at 502. Obtaining such evidence requires "itemizing specific tasks"

28

and "the time required for those tasks[.]" *Id.* at 495 (quoting *City of Laredo v. Montano*, 414 S.W.3d 713, 736 (Tex. 2013) (per curiam)).

In rare circumstances, the lodestar figure may be adjusted upward or downward, but only if specific evidence overcomes the presumption of reasonableness and shows that the adjustment is necessary to achieve a reasonable fee award. *Id.* at 501-02. The lodestar figure may not be adjusted based on considerations that are already inherently subsumed within the lodestar calculation. *Id.* at 501. The lodestar calculation already takes into account several considerations including,

> "the time and labor required," "the novelty and difficulty of the questions involved," "the skill required to perform the legal service properly," "the fee customarily charged in the locality for similar legal services," "the amount involved," "the experience, reputation, and ability of the lawyer or lawyers performing the services," "whether the fee is fixed or contingent on results obtained," "the uncertainty of collection before the legal services have been rendered," and "results obtained."

*Id.* at 500 (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (sub. op. on denial of reh'g).

Section 114.064 of the Texas Trust Act provides that "[i]n any proceeding under this code the court may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just." *See* Tex. Prop. Code Ann. § 114.064. In any proceeding under the UDJA, the court "may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac.

29

& Rem. Code Ann. § 37.009. The UDJA "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). A trial court abuses its discretion in awarding fees under the UDJA if there is insufficient evidence that the fees were reasonable and necessary. *See id.*

A party seeking attorney's fees must "segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). For a time, the Texas Supreme Court recognized an exception to this rule when "the same set of facts or circumstances" were intertwined to the point of being inseparable. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991). But in *Tony Gullo Motors I, L.P. v. Chapa*, the Court modified the exception such that when a party incurs attorney's fees related to a claim on which fees are unrecoverable, the party must segregate the recoverable from the unrecoverable fees. *Chapa*, 212 S.W.3d at 313-14. In *Chapa*, the prevailing party asserted a DTPA claim (fees recoverable) and a fraud claim (fees not recoverable). *Id.* at 304. By way of example, the Court pointed out that the attorney's time in drafting the portion of the pleadings or the jury charge related to the fraud claim were not recoverable and had to be segregated. *Id.* at 313. While claims may

30

depend on the same facts, "that does not mean they all required the same research, discovery, proof, or legal expertise." *Id.* Nonetheless, the Court cautioned that courts should not require precise allocation of fees to one claim or another and agreed that some services (such as standard discovery, depositions of primary actors, discovery motions and hearings) might be necessary regardless of the number of claims asserted. *Id.* However,

> if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.

*Id.* at 313-14.

At trial, James Stilwell, defense counsel who represented all Defendants, testified that it would be equitable and just for the trial court to award the Defendants their reasonable and necessary attorney's fees. Stilwell testified that the Defendants had "no wrongdoing" and had "performed all aspects of the settlement," and that equity and justice should not require them to bear the fees involved. Stilwell also stated that Eaker filed at least five amended pleadings with "an ever-changing moving target of allegations" to which the Defendants had to respond. Defendant's Exhibit 1, an Attorney's Fees Chart and Segregation of Fees, and Exhibit 3, Stilwell's resume, were admitted into evidence without objection. Defendant's Exhibit 2, Stilwell's invoices for the case, was offered into evidence. Plaintiff's

31

counsel objected to Defendant's Exhibit 2, arguing that Eaker did not bring a cause of action against the Defendants under the Texas Property Code and there is no basis for recovery of attorney's fees, that the attorney's fees are not equitable and just under the UDJA or the Texas Trust Code, that the attorney's fees are not reasonable and necessary under the UDJA or the Texas Trust Code, and that the attorney's fees are not properly segregated and included attorney's fees that were not recoverable. Exhibit 2 was admitted at trial over Plaintiff's objections.

Stilwell testified that the Defendants pleaded two different bases for attorney's fees in this suit. The attorney's fees were sought under section 37.009 of the Texas Civil Practice and Remedies Code (the UDJA) and also section 114.064 of the Texas Property Code (the Texas Trust Act), and the Defendants argued that Exhibit 2 would support either theory for a recovery of fees. Exhibit 2 included invoices throughout the case that noted which fees related to which claims, itemized the legal tasks, who completed the task, and the time and fee for the task.

Stilwell testified with respect to the factors that are required to be considered related to the reasonableness and necessity of his fees: time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly. Stilwell testified to his hourly rate, his associates' hourly rate, and his staff's hourly rate, and explained their level of experience and that they charge for actual time expended at rates that are reasonable for the jurisdiction.

According to Stilwell, the time and labor for the services have been documented on the invoices and summarized on exhibits admitted. Stilwell explained the substantive issues involved in the case and how that affected hourly rates charged. According to Stilwell, the hourly rates charged by him, his associates, and staff are reasonable for each person's respective skill level and in line with what is customarily charged locally. Stilwell testified that the fees were reasonable and necessary in light of the following: that Eaker was unsuccessful in her claims, Eaker should not have brought the specific claim in the first place, Eaker sued not only Stilwell's clients but also him and his law firm, the fact that the court already awarded fees for Stilwell and his firm's defense in a Rule 91A hearing for plaintiff bringing a baseless cause of action "is a factor that the court should be aware of in understanding the kinds of claims that have been brought and the lengths that [Eaker] went to in bringing them[,]" that Eaker brought "what felt like a never ending set of changes in the petition. . . . [a]nd every time we got claims knocked out on summary judgment, there were a new round of claims thrown into the lawsuit []." Stilwell testified that Maria and Eaker sued his clients in two prior suits, that this was the third lawsuit, and that Eaker has filed a fourth matter, and that (except for a courtesy discount he gave his clients that he has also extended to Eaker in asking for fees) he did not change his rates. Stilwell testified that his resume which was admitted into evidence reflects his honors, education, and experience. According to Stilwell, it is his opinion that the reasonable

33

fee for the necessary services and expenses that the Defendants incurred in the case through trial was $86,883.10 and that the reasonable fees and necessary services and expenses the Defendants incurred in the court of appeals for the past premature appeal on which the Defendants prevailed was $1,735.29. Stilwell also testified to the following potential additional reasonable and necessary fees: $15,000 if a party files a petition for review to the Supreme Court, $15,000 if merit briefings are granted by the Texas Supreme Court, and $10,000 if oral argument are granted by the Texas Supreme Court.

As to segregation of fees, Stillwell testified as follows:

[I]t is my testimony that the invoices in Exhibit 2 contain work that is either on claims for which recovery is allowed in this case, the declaratory judgment act and the trust act, or is for discrete legal services advancing both recoverable and unrecoverable claims, not requiring segregation. Save and except for those matters denoted in the invoices in my handwriting in red ink and the invoices that I have line-itemed in Exhibit 1 which were for tasks on matters for which fees cannot be recovered and were not also advancing the declaratory judgment act claim.

And additionally, the green ink items that are recoverable but are separately categorized because they related to a premature appeal before the court of appeals which has been completed in favor of my clients.

So the various iterations of the plaintiff's petition in this matter contain both breach of contract claims and other claims but also sought as many as 15 different declarations about the very same contract. The task described on the invoices in some instances were necessary for the declarations in the declaratory judgment had been the sole claim in the suit. And there were other claims in discrete tasks that are identified in the invoices that were for the contract claim but also advance the defense of one or more of the declarations sought in the petition. A good

34

example of that would be the depositions that were taken of my client and the depositions of the annuity contract representative in this case.

Had the sole claims in the case been on the declaratory judgment, we would have had to take those depositions and the time would have been recoverable and the fact that there were also matters discussed by the plaintiff in the case relating to the breach of contract claims does not make them unrecoverable. I would have had to attend the depositions whether there was a breach of contract claim or not, and I could not have known in advance exactly what time in the deposition [plaintiff's counsel] would have been asking breach of contract claims or matters that were only on breach of contract and not also related to the declaratory judgment act.

The supreme court in the *Chapa* case said very specifically that depositions are among those items that frequently advance both a[n] unrecoverable and recoverable claim and which can be recovered under the standard of the court.

On cross-examination, Stilwell further testified:

There are some [of] the services that are described in Exhibit 2 which were solely on the declaratory judgment. And a good example[] of that, where I think there were three options for summary judgment on the declaratory judgment action case. Those were solely on declaratory judgment. They didn't advance multiple causes of action, straight up, just on declaratory judgment, absolutely recoverable under the *Chapa* standard.

Second, there were discrete services that were outlined in Exhibit 2 that advanced the work on the declaratory judgment case, but they have also advanced the defense of the breach of contract case. . . . And so they are also those items in Exhibit 2 which I have not segregated out because the *Chapa* standard said specifically that you do not need to segregate out.

Stilwell testified he segregated out fee entries in red ink solely for the breach of contract claim and did not ask for recovery of those fees, but that he sought recovery for matters on both breach of contract and declaratory judgment as allowed under *Chapa*—advancing both a claim for which attorney's fees are recoverable and a

35

claim for which attorney's fees are not recoverable. Stilwell explained that he also conservatively segregated out entries having to do with breach of fiduciary duty and gross negligence even though his opinion was that he could recover those fees as well under the Texas Trust Act.

After Eaker presented no evidence at trial as to her claim for attorney's fees for her UDJA claim, the trial court granted Defendants' motion for a directed verdict and ruled that Plaintiff should take nothing on her claim for attorney's fees under the UDJA.

The trial court entered findings of fact and conclusions of law regarding the attorney's fees. In a bench trial, such findings and conclusions have the same force and dignity as a jury's verdict. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's Findings of Fact and Conclusions of Law included the following regarding attorney's fees, in relevant part:

FINDINGS OF FACT:

. . . .

[] Both Plaintiff and Defendant[s] requested recovery of their attorneys' fees under the UDJA (specifically, Texas Civil Practice and Remedies Code, Section 37.009).

[] Plaintiff did not put on any evidence or regarding the amount, reasonableness, or necessity of any attorney's fees incurred by Plaintiff.

[] Defendants also plead[ed] for recovery of attorneys' fees under Texas Trust Act (codified in the Texas Property Code) section 114.064.

36

[] Defendants put on the testimony of James H. Stilwell, and offered 3 exhibits which were admitted (invoices, a fees summary chart, and the CV/resume of James H. Stilwell) supporting Defendants' attorneys' fees claim. Stilwell's testimony, in conjunction with the three exhibits addressed each of the factors set forth in Tex. Disc. R. Prof'l Conduct 1.04(b) and *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997).

[] Defendants also offered evidence through Stilwell's testimony and the invoices and fees-summary-chart exhibits regarding the segregation out of attorneys' fees for discrete legal tasks solely for causes of action for which fees are not recoverable. Defendants also offered evidence through testimony and the invoices and fees summary chart exhibits regarding the discrete legal tasks which were either for causes of action for which fees are recoverable, or which advanced claims or defenses on both recoverable and non-recoverable causes of action.

[] Defendants segregated the fees for which they sought recovery.

[] The testimony and evidence supported the reasonableness, necessity, and amount of the attorneys' fees incurred through trial and for a past completed, premature appeal filed by Plaintiff which Defendants were successful in having dismissed. The testimony and evidence also supported the reasonableness, necessity, and amount of attorneys' fees, if required, to be incurred on appeal at various stages of appeal.

[] Based on the testimony and evidence, Defendants' attorneys' fees for defending the UDJA claims herein and defending the proceeding involving the Co-Trustees and Trust are both reasonable and necessary.

[] Defendant Co-Trustees and the Trust incurred $86,883.10 in reasonable and necessary attorneys' fees through time of trial.

[] Defendant Co-Trustees and the Trust incurred $1,375.29 in reasonable and necessary attorneys' fees for a past, premature appeal filed by Plaintiff, which Defendants were successful in having dismissed.

. . . .

37

[] Defendants provided testimony regarding why awarding attorneys' fees to Defendants would be equitable and just in this matter, including the fact that this is the third lawsuit that [Eaker] or her sister has brought against Joseph and John Mangiameli over Jole Eaker's estate and trust; that Jole Eaker did not want [Eaker] to handle Jole's estate or trust; that Jole did want John and Joseph to handle her estate and trust; that John and Joseph as Co-Trustees fully complied with the terms of the mediated Settlement Agreement and did not breach it; and that [Eaker] brought an ever-changing set of claims in this lawsuit (including against her opposing counsel and her opposing counsel's law firm), modifying her claims each time Co-Trustees John & Joseph had motions for summary judgment pending. Additionally, although Plaintiff had not received any payouts from the annuity purchased by the Trust as of the time of trial, as reflected in one of Plaintiff's exhibits, the annuity advisor recommended no payouts for a 3 year period which has not fully elapsed; and Plaintiff received other compensation in the settlement beyond any future annuity payouts, including a house, assignment of her of a sizeable note held by the Trust providing her an income stream, and personal property. Defendants prevailed on all claims.

[] It is equitable and just to award recovery of reasonable and necessary attorneys' fees to Defendants and would not be equitable or just to award recovery of attorneys' fees to Plaintiff.

[] Defendants requested recovery of their costs of court and should recover same.

[] After Plaintiff had rested its case-in-chief, Defendants moved for a Directed Verdict on Plaintiff's claims for recovery of attorneys' fees, which Motion was granted.

[] The court reduced the amount of reasonable and necessary attorney fees requested a[s] follows, as the court finds that these amounts were solely applicable to the resolution of the breach of contract claim.
    a. 11/26/18: $1,330.00
    b. 11/27/18: $1,470.00
    c. 11/27/18: $175.00
    d. 11/27/18: $12.50
    e. 11/30/18: $275.00

f.   11/30/18: $700.00

CONCLUSIONS OF LAW

. . . .

[] Section 37.009 of the UDJA allows the Court to award costs and reasonable and necessary attorneys' fees as are equitable and just.

[] The Court may give a fee award to either party in a UDJA case. *MBM Fin. Corp. v. Woodlands Oper. Co.*, 292 S.W.3d 660, 669 (Tex. 2009).

. . . .

[] Texas Property Code Section 114.064 (part of the Texas Trust Act) provides that in any proceeding under the Trust Act, the Court may award costs and reasonable and necessary attorneys' fees as are equitable and just.

[] Plaintiff's claims against the Co-Trustees and Trust are proceedings under the Trust Act. *See Hatchar v. Hatchar*, 153 S.W.3d 138, 141-144 (Tex. App.—San Antonio, 2004) (Awarding fees under Section 114.064 of the Texas Property Code in a case involving allegations regarding breach of fiduciary duty by a trustee); and *Lyco Acquisition 1984 Ltd. Partnership v. First Nat'l Bank*, 860 S.W.2d 117, 120 (Tex. App.—Amarillo, 1993) (Awarding fees under Section 114.064 of the Texas Property Code in a case involving a negligence claim and a conversion claim against a bank acting as a trustee and finding such claims against the trustee constituted a proceeding under the Trust Act for which fees could be awarded).

[] *Tony Gullo Motors, I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006) specifies that attorneys' fees must be segregated between time on claims for which fees can be recovered, and time on claims for which fees cannot be recovered; and also provides that when legal services advance both a recoverable and unrecoverable claim those fees need not be segregated.

[] Defendants segregated the fees for which they sought recovery.

39



[] It is equitable and just to award reasonable and necessary attorney[']s fees and costs to Defendants.

[] Plaintiff did not offer any evidence or provide any witness testimony to support recovery of any attorneys' fees incurred by Plaintiff, including providing no testimony and no exhibits as to the amount of fees incurred by Plaintiff.

[] A Directed Verdict (or Motion for Judgment in a non-jury trial) is proper when the evidence does not raise a fact issue on a material issue in the suit. []

[] After Plaintiff had rested its case-in-chief, Defendants moved for a Directed Verdict (also called a Motion for Judgment in a non-jury trial) on Plaintiff's claims for recovery of attorneys' fees, which Motion was proper and granted.

To the extent Eaker argues that the Defendants are not entitled to attorney's fees under Chapter 38, Stilwell testified at trial that the Defendants were not seeking recovery of attorney's fees under Chapter 38. Also, to the extent that Eaker argues that the Defendants are not entitled to recover attorney's fees under the Texas Trust Act in the Property Code, Stilwell testified that the $86,883.10 in fees was reasonable and necessary and just and equitable attorney's fees and that such amount did not include any amount under the Texas Trust Act although he believed the Defendants were entitled to those fees. The trial court in its findings found that Defendant Co-Trustees and the Trust incurred that amount in reasonable and necessary attorney's fees through time of trial, and then adjusted that downward. On this record, we conclude there was sufficient evidence to support the attorney's fees that the trial court awarded, that the fees were equitable and just and reasonable and

40

necessary under Chapter 37, and the trial court did not abuse its discretion in awarding Defendants the attorney's fees. Also, because there was sufficient evidence that Defendants properly segregated their fees, the trial court did not err in awarding the fees. We overrule issues four and five.

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 25, 2021
Opinion Delivered October 28, 2021

Before Kreger, Horton and Johnson, JJ.